**Roy A. LUDWIG, Plaintiff,**

v.

**NYNEX SERVICE COMPANY, A WHOLLY OWNED SUBSIDIARY OF NYNEX CORPORATION; NYNEX Management Pension Plan; NYNEX Corporation Savings Plan for Salaried Employees; NYNEX Management Medical Plan; NYNEX Dental Plan; NYNEX Management Vision Care Plan; NYNEX Sickness and Accident Disability Plan; NYNEX Long Term Disability Plan for Salaried Employees; NYNEX Group Life Insurance Plan; NYNEX Corporation Voluntary Contribution Plan, Defendants.**

No. 90 Civ. 5459 (JMC).

United States District Court,
S.D. New York.

Nov. 16, 1993.

772

---

## MEMORANDUM AND ORDER

CANNELLA, District Judge.

Defendants' motion to amend their answer is granted. Fed.R.Civ.P. 15(a). Defendants' motion for summary judgment is granted. Fed.R.Civ.P. 56(c).

### BACKGROUND

Plaintiff Roy A. Ludwig brought this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001–1461 (1988 & Supp. II 1990) [hereinafter ERISA], against the defendants[1] to recover pension distributions and other employee benefits allegedly due plaintiff under employee benefit plans administered by the defendants, and to obtain a declaratory judgment regarding his portability rights with respect to such plans. Plaintiff also seeks relief under the state common-law theories of promissory estoppel and breach of contract. Plaintiff asserts that federal subject matter jurisdiction over these state-law claims is founded upon diversity and pendent jurisdiction.[2]

---

1. In its answer and motion papers, defendant NYNEX Service Company asserts that it has changed its legal name to Telesector Resources Group, Inc. The parties do not make any assertions as to when this change of name took place. For purposes of clarity, this memorandum and order will refer to named defendant NYNEX Service Company as "NYNEX."

2. The Court notes that Congress's codification of the federal common law doctrines of pendent and ancillary jurisdiction in 28 U.S.C. § 1367 (Supp. II 1990) under the rubric "supplemental jurisdiction" is not applicable to this action insofar as section 1367 only applies to civil actions commenced on or after December 1, 1990. Plaintiff commenced this action on August 10, 1990.

Plaintiff claims that, as a retiree from American Telephone and Telegraph Company [hereinafter AT & T], he was entitled to the continued receipt of pension and other benefits[3] after commencing employment with NYNEX.[4] Defendants, in turn, argue that they were obligated under the Mandatory Portability Agreement[5] to treat Ludwig's pension as portable, that is, to carry forward his prior service credits from AT & T. Defendant NYNEX thus suspended payments to Ludwig in August 1989 upon its determination of his portability status. Defendants now move for summary judgment dismissing Ludwig's claims.

Viewed in the light most favorable to the plaintiff, the facts of this case are as follows. Plaintiff Roy A. Ludwig, a domiciliary of New Jersey,[6] commenced employment with New York Telephone on March 4, 1957. Ludwig worked with New York Telephone until November 30, 1983, eventually advancing to a management position in the network department of this firm as a special service design engineer. On December 1, 1983, Ludwig began employment with AT & T, where he continued to work until his retirement therefrom on May 31, 1988. At AT & T, Ludwig held the position of regional telecommunications manager and possessed expertise in the specific fields of design engineering and contract regulation work.[7]

During July and August 1988, Ludwig had conversations with two different employees of NYNEX during which he discussed career opportunities with the firm. Ludwig first met with Lawrence J. Chu, then employed as a management employee of NYNEX. Ludwig alleges that Chu, as a personal friend of plaintiff, initiated this meeting for the purpose of discussing Ludwig's potential em-

---

3. Plaintiff alleges that he received the following AT & T benefits from June 1, 1988 through August 31, 1989: (1) a net pension of $1,701.60 per month subject to increase for cost-of-living adjustments; (2) medical expense plan coverage at no cost to plaintiff and dependent medical coverage at a cost of $50.00 per month (including a major medical lifetime coverage of up to $250,000.00 for himself and his spouse); (3) free dental plan coverage; (4) free group-term life insurance for the face amount of $57,000.00; and (5) long-distance telephone reimbursement covering 100% for the first $35 of monthly usage and 50% for the next $65 of monthly usage.

4. Ludwig alleges that he received his last monthly pension payment from AT & T on or about August 1, 1989. See Ludwig Aff., Exh. G, at 82 (deposition of Roy A. Ludwig).

5. The Mandatory Portability Agreement is an agreement originally entered into between American Information Technologies Corporation, American Telephone and Telegraph Company, Bell Atlantic Corporation, Bell Communications Research, Inc., Bellsouth Corporation, Cincinnati Bell Telephone Company, NYNEX Corporation, Pacific Telesis Group, The Southern New England Telephone Company, Southwestern Bell Corporation, and U.S. West, Inc. This agreement provides for the interchange of benefit obligations and the mutual recognition of service credit upon the transfer to, or employment of, any "covered employee" by a company that was a signatory to this agreement. The agreement defines the term "covered employee" to include a former employee of a signatory company who, on December 31, 1983, was a participant in such company's pension plan. See Flaherty Aff., Exh. E, at 7.

According to its preamble, the Mandatory Portability Agreement was entered into to assure compliance with section 559 of The Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 900–01 (1984) [hereinafter DEFRA]. This legislation indefinitely extended the termination date for the recognition of portability of service credit for covered employees pursuant to a private contract among the companies affected by the plan of reorganization for the divestiture of the Bell System companies ("The Divestiture Interchange Agreement"). This plan of reorganization was approved by United States District Judge Harold H. Greene on August 5, 1983 in *United States v. Western Electric Co.*, 569 F.Supp. 1057 (D.D.C.), *aff'd sub nom. California v. United States*, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983).

6. None of the parties to this action make any formal assertions as to the citizenship of the defendants for the purpose of establishing, or negating, the Court's diversity jurisdiction over plaintiff's non-federal claims. As the Court shall later discuss, however, to the extent that these claims are cognizable under federal law, they may be recharacterized as federal claims.

7. The duration of Ludwig's employment with AT & T encompassed the date of December 31, 1983, which as this memorandum and order shall further explain, is a most critical date in determining the rights of the parties to this action. Furthermore, because plaintiff left New York Telephone and began his employment with AT & T prior to December 31, 1983, no controversy arises with respect to plaintiff's portability rights in connection with this particular separation from service.

ployment as an "associate director" with NYNEX.[8] Shortly thereafter, Ludwig met with Charles White on July 21, 1988, then employed as a staff director in the personnel department at NYNEX, for the purpose of interviewing Ludwig for an associate director position with the firm. At this interview, Ludwig alleges that he specifically told White that if he were hired by NYNEX, he did not wish to be considered a portable employee insofar as this status would entail the carrying forward of his prior service credits from AT & T, and would therefore result in the suspension of his pension and other employee benefits that he was receiving from AT & T. Ludwig also alleges that he told White that he would not accept employment with NYNEX unless he were treated as a non-portable employee, and that he further made this position known to White through his refusal, at that time, to sign a release acknowledging his eligibility for portability rights. According to plaintiff, White told Ludwig that all new employees, whether or not eligible for portability, signed the release and that this action constituted a mere matter of procedure without substantive effect. *See* Ludwig Aff. at 5. Ludwig further alleges that, at this meeting, White demonstrated an understanding of Ludwig's concerns and evinced an appreciation of the ramifications that would ensue through any determination of plaintiff's portability status. Ludwig, however, does not allege that White, at this interview of July 21, 1988, made any statement to Ludwig, either affirmative or hypothetical, concerning whether Ludwig would indeed be considered a non-portable employee for the purpose of determining his pension rights in the event that Ludwig were to become employed by NYNEX.[9]

Despite his alleged refusal to sign the release at the time of the interview, plaintiff, approximately eleven days thereafter, did just that.[10] On or about August 1, 1988, Ludwig signed the release, dated it August 1, 1988, and mailed it to White.[11]

8. During this time frame, an internal document was generated by NYNEX regarding Ludwig's candidacy for an associate director position with the firm. In this document dated July 8, 1988, a NYNEX employee from the personnel department named Kathy Salerno wrote a memorandum to another NYNEX employee named Doris French noting that Ludwig was being considered for a position with the firm, and if hired, "should be informed that he will be treated as a new hire." Ludwig Aff., Exh. A. Plaintiff does not allege that he obtained access to this internal memorandum prior to his commencement of this action.

9. In his deposition testimony, White testified that during his initial meeting with Roy Ludwig on July 21, 1988, Ludwig unequivocally specified that he did not want his pension to be portable because non-portability would allow him to continue to receive his pension and other benefits from AT & T. *See* Ludwig Aff., Exh. B, at 71, 76, 82 (deposition of Charles White). White further testified that, at this initial meeting, he was aware that Ludwig was retired. *See id.* at 72. White stated, however, that he did not believe Ludwig had implied that an acknowledgment by NYNEX of plaintiff's waiver of his portability rights served as a prerequisite to plaintiff's acceptance of a position with NYNEX. *See id.* at 83.

10. In his deposition, Ludwig testified that, approximately one or two days after his interview with Charles White, he sent a letter to the secretary of the benefits committee at *AT & T* in which he expressed concern about the Mandatory Portability Agreement because he was aware that he met the criteria for being a covered person thereunder. In this letter, plaintiff, in addressing the consequences of this agreement upon his pension distributions, wrote as follows:

The benefit office [at AT & T] tells me that it is mandatory and my pension will be stopped by AT & T and my service bridged with the regional holding company. Is there a waiver if I do not wish to be a part of the MPA program? Also, when will the MPA program expire? According to the POR, as the shared network facility agreements (SNFA) expire, the portability agreement will expire also. There are time frames as to how long another company can perform work for another in the POR, page 28. How could a voluntary retirement be changed? ...

Ludwig Aff., Exh. G, at 38 (deposition of Roy A. Ludwig).

11. This release that Ludwig signed reads as follows (bold emphasis added):

*RELEASE FORM FOR EMPLOYEES COVERED BY SECTION 559 OF THE TAX REFORM ACT OF 1984*

Under Section 559 of the Tax Reform Act of 1984, in the case of a change in employment on or after January 1, 1985 by a covered employee from a covered position in a covered company to a covered position in a covered company, service credit will be recognized by the hiring company. The following explains the above statement in detail.

On 12/31/83 an employee must either have been an active employee eligible to participate in the

Plaintiff further alleges that on August 15, 1988, he received a written offer of employ-ment [12] for the position of associate director with NYNEX.[13] Although the writing provided for a starting date of August 22, 1988, Ludwig commenced his employment with NYNEX on August 18, 1988. Under the terms of this employment agreement, Ludwig was to be paid an annual salary of $49,700.00.[14]

Bell System Pension Plan, Cincinnati Bell Pension Plan, or Southern New England Telephone Pension Plan (or on leave of absence and reinstated at or before expiration or leave or on layoff status with recall or rehire rights) *or* an active management employee whose "annual base rate of pay" (basic salary plus compensation includable in the calculation of a pension under the Bell System Management Pension) does not exceed $50,000.
 and
On the date of termination at a covered company is eligible to participate in that company's non-management pension plan *or* a management employee whose annual base rate of pay does not exceed the amount of $50,000 adjusted monthly by the consumer price index.
 and
On date of hire at a covered company is eligible to participate in that company's non-management pension plan *or* a management employee whose basic salary as of the date of hire does not exceed the amount of $50,000 adjusted monthly by the consumer price index.

---

I have read the statements above describing an employee eligible for portability of service under Section 559 of the Tax Reform Act of 1984. I am eligible for portability of service credit. I acknowledge that NYNEX is granting me one year of temporary net credited service at date of hire so that I may receive benefits allowed a covered employee. If NYNEX rules that I am covered, my service will be bridged. If NYNEX rules that I am not a covered employee, my net credited service date will be corrected to reflect the date of hire and my coverage and participation under my employers' benefit plans will be adjusted to reflect my corrected net credited service date. If I am not a covered employee, I agree to reimburse the company for the costs of benefits which were provided as a result of my signature on this release form.

Roy A. Ludwig (signed) August 1, 1988 (signed)
(Employee Signature) (Date)

12. Plaintiff does not allege in his opposition papers to what extent, if any, White and Ludwig had further discussions involving the extension of a verbal offer during the time period between July 21, 1988 and July 31, 1988. In his deposition testimony, Charles White testified that it was his firm's standard practice to first verbally extend an offer of employment to a prospective employee, and thereafter confirm it in writing. *See id.* at 42–43. White further testified that he sent a confirmatory letter to Roy Ludwig that alluded to a verbal offer that had been previously made. *See id.* However, it is not entirely clear whether the alleged verbal offer of employment would have been made at the time of Roy Ludwig's interview with Charles White at the offices of NYNEX on July 21, 1988, or whether such offer would have been made via telephone shortly thereafter. Although plaintiff in his affidavit does not specifically allege that a verbal offer was made at the time of the interview, he does suggest that this may have been the case insofar as he alleges that, at the time of this interview, Charles White asked him to sign a release form regarding his portability rights.

13. The parties are in dispute as to the legal effect of the letter sent by White to Ludwig in regards to whether it constituted an offer of employment, as Ludwig asserts, or whether this letter was merely confirmatory of a prior offer of employment that plaintiff had accepted at an earlier date, as defendants contend. *See* Ludwig Aff., Exh. B, at 42–43 (deposition of Charles White). This latter interpretation is supported by the language of this letter which reads in part "Dear Mr. Ludwig: I am very pleased that you decided to accept my offer of employment with NYNEX." Flaherty Aff., Exh. D.

14. The written offer dated August 15, 1988 to which plaintiff refers, and which the defendants regard as a confirmatory memorandum that describes and lends greater definition to prior agreed upon terms, provides in pertinent part:

August 15, 1988
Roy A. Ludwig
P.O. Box 979
Highland Lakes, New Jersey 07422
Dear Mr. Ludwig:
I am very pleased that you decided to accept my offer of employment with NYNEX.
The job you have been offered is contingent upon medical clearance. This will confirm the specific details of the job offer.
Job Title: Associate Director
Department: NYNEX Service Company
Salary: $49,700
Work Location: 21 Penn Plaza
Report Date & Time: August 22, 1988; 9:00 A.M.
Supervisor: Mr. L.J. Chu
This is to advise you that a condition of your employment is the requirement that you sign an employee agreement assigning rights, and title to certain intellectual property as stated on the employment application to NYNEX and to protect company proprietary information. In addition, upon hire you will be required to produce documentation establishing both your identity and employment authorization as required by law.
You can be sure that your career with the Company will prove to be an interesting and

On or about August 22, 1988, Ludwig completed a number of forms for NYNEX's personnel department. The remarks written thereon by NYNEX's employees regarding Ludwig's employment status described plaintiff alternatively as a "new hire," a "new hire from AT & T," or possessing prior "Bell Service." Ludwig Aff., Exh. E. Ludwig does not allege that, at the time of completing these forms, any employees of NYNEX made any representations to him regarding the portability of his pension.[15]

Ludwig alleges that on two separate occasions subsequent to his commencement of employment with NYNEX, he received telephone calls from Charles White during which White asked Ludwig if he wanted his pension to be portable. The first occasion occurred near the end of September 1988, and the second transpired in either late November or early December 1988. On both occasions, Ludwig alleges that he emphatically told White that he did not want his pension to be portable. On the second occasion, plaintiff alleges that in response to White's inquiry, Ludwig asked White why he continued to call regarding this matter, to which White responded that somebody else had directed him to do so.

Between August 18, 1988 and June 30, 1989, NYNEX treated Ludwig as a "new hire" without providing him with any prior service credit, contingent or otherwise, to reflect his prior employment with AT & T. (Thus, during this time period, Ludwig received the pension benefits from AT & T described *supra*.) In its answer, defendant NYNEX admits that an employee who claimed entitlement to portability would, as a matter of company policy, receive one year of net credited service conditional upon the later determination of such employee's portability status. One year's net credited service would entitle such employee to a company contribution under the NYNEX Management Medical Plan, participation in the NYNEX Corporation Savings Plan for Salaried Employees, additional paid vacation time, and telephone concession service.[16] NYNEX further admits that between August 18, 1988 and June 30, 1989, plaintiff was coded in NYNEX's personnel records with a net credited service date of August 18, 1988.[17] As a result of this treatment as a non-portable employee, plaintiff did not receive these employee benefits to which he otherwise would have been entitled had he been regarded as an employee eligible for portability of service

challenging one. Should you have any questions regarding the Company or the job offer, don't hesitate to call me.
Sincerely,
Chuck White (signed)
C. White
Staff Director
NYNEX Management Employment
The Court notes that this writing makes no reference to the release that plaintiff signed and dated August 1, 1988 in which Ludwig acknowledged that if NYNEX were to rule that he was a covered employee within the purview of section 559 of DEFRA, his service would be bridged.

15. Plaintiff has included among his exhibits in support of his opposition brief a document dated September 27, 1990, in which an employee of NYNEX named Jo Mack remarks that Roy Ludwig was "added to the payroll on 8/18/88 as a new hire with no previous service" and was therefore "coded A2." Ludwig Aff., Exh. F. An accompanying copy of a computer printout similarly reflects Ludwig's coding as an "A2 employee" of NYNEX effective August 18, 1988. Plaintiff, however, does not allege that he became aware of this printout, or any internal significance that might attach to it, until after he commenced this action.

Plaintiff also alleges that the defendants failed to timely complete and process a form, denominated the MPA–1 Form, that NYNEX, as a matter of standard procedure, used in order to inform its administrative office of an employee's eligibility for portability. In his deposition testimony, NYNEX employee Charles White acknowledged that this form was not fully completed and signed by White prior to Ludwig's commencement of employment with NYNEX. *See* Ludwig Aff., Exh. B, at 48–52.

16. This policy, whereby newly hired employees who claimed prior creditable service were provided with a provisional service credit of one year until a final determination of portability could be made by the relevant administrative office, is reflected in an internal memorandum dated August 28, 1985, that was distributed among various district staff managers of NYNEX. *See* Ludwig Aff., Exh. I. Plaintiff does not specifically allege that he read this document before the time that his AT & T pension and other ancillary benefits were suspended effective August 31, 1989.

17. Defendants assert that this coding of Ludwig as a new hire was erroneous and constituted an unintended deviation from company policy.

credit.[18] One practical ramification of this is illustrated through plaintiff's allegation that, on March 29, 1989, he was refused participation in the NYNEX Savings Plan for Salaried Employees on the basis that, according to NYNEX personnel records, he had less than one year of net credited service.[19]

On June 27, 1989, the defendants formally determined that plaintiff was eligible for portability of service credit under the Mandatory Portability Agreement, and, on or about that same date, forwarded a request to AT & T for the transfer, from AT & T to NYNEX, of the pension assets attributable to Ludwig's pension account with AT & T.[20] See Ludwig Aff., Exh. B, at 65–66 (deposition of Charles White). Plaintiff was not informed, at this time, of the defendants' determination and subsequent action. Plaintiff alleges in his affidavit that he first learned of the defendants' decision in early July 1989 upon being alerted by Larry Chu that the NYNEX payroll office had received notice to change his net credited service date to 1957 to reflect his prior service with New York Telephone and AT & T.[21]

Between the time that he was informed of the defendants' portability decision and his receipt of his final pension check from AT & T, Ludwig spoke with two separate NYNEX employees regarding his rights and the eventual suspension of his pension benefits. On or about July 13, 1989, Ludwig spoke with Deborah Tyler, the staff manager for pension administration on the staff of the Secretary of the NYNEX Employees' Benefits Committee. Ludwig alleges that Tyler did not inform him that he could appeal the portability decision. Shortly thereafter, Ludwig spoke with Elizabeth B. Flaherty, an attorney who worked for the NYNEX Legal Department, who, according to plaintiff, advised him that NYNEX was complying with the applicable portability laws. Plaintiff further alleges that Flaherty did not advise him of any appeal procedures.

Plaintiff alleges that he received his last pension payment from AT & T on August 1, 1989. It was not until September 1, 1989, when he failed to receive his monthly pension stipend, that his concern renewed that his service had been bridged to reflect his prior employment. See Ludwig Aff., Exh. G., at 82 (deposition of Roy A. Ludwig). At this point in time, Ludwig alleges that he called the AT & T benefits office which advised him that he would have to wait until at least September 7, 1989, before it could trace the pension check. Thereafter, on September 7th, AT &

18. Although, during this period spanning from August 18, 1988 through June 30, 1989, Ludwig was ineligible to participate in the NYNEX benefits to which he otherwise would have been entitled had he been credited with one year of temporary service credit, he nevertheless continued to enjoy his retirement benefits from AT & T.

19. Ludwig further alleges that on account of NYNEX's denial of his application to participate in this savings plan, he was unable to rollover into a NYNEX plan the proceeds that he received upon the liquidation of his AT & T Savings Plan, and that this resulted in current income tax consequences to him. Ludwig acknowledges in his deposition testimony, however, that such tax consequences could have been avoided through a timely rollover of the AT & T Savings Plan proceeds into an Individual Retirement Account [IRA]. See Ludwig Aff., Exh. G, at 58 (deposition of Roy A. Ludwig).

In addition, defendant NYNEX admits in its answer that plaintiff paid the premium for coverage under its medical plan for the month of September. It is unclear whether defendant was referring to the month of September in the year 1988 or 1989. Further, plaintiff has not alleged that he has pursued plan administrative remedies to obtain reimbursement of this premium payment.

20. The date of NYNEX's determination of plaintiff's portability status is more than ten months after August 18, 1988, the date on which plaintiff commenced employment with NYNEX. In his deposition testimony, NYNEX employee Charles White stated that he was not aware of any formal policy as to how long it takes for NYNEX to determine whether an employee is portable, and that he is advised by his superiors to inform candidates for employment that this decision usually takes between three to four months. See Ludwig Aff., Exh. B, at 93 (deposition of Charles White).

21. In his deposition, Ludwig testified that he first learned from his former employer, AT & T, that his pension was portable. It is not clear whether this statement refers to Ludwig's awareness that he was a covered person under the Mandatory Portability Agreement, or to his knowledge that his pension account had been transferred from AT & T to NYNEX. See Ludwig Aff., Exh. G, at 69 (deposition of Roy A. Ludwig).

T informed Ludwig that his pension had been declared portable.[22]

During the next two months, Ludwig and his legal counsel wrote two separate letters to NYNEX officials objecting to NYNEX's portability determination and demanding the reinstatement of plaintiff's monthly pension payments. On September 12, 1989, plaintiff wrote a letter to Robert Donovan, NYNEX's Managing Director of Personnel, in which he insisted upon NYNEX's restoration of the benefits that he had been receiving from AT & T. *See* Ludwig Aff., Exh. K. Responding in a letter dated October 19, 1989, Donovan replied that, in light of Ludwig's service history, federal law required that Ludwig's prior service credits be bridged and, therefore, he could not collect his AT & T pension while working for NYNEX. *See* Ludwig Aff., Exh. L.[23] Then, on November 10, 1989, plaintiff's counsel wrote Donovan requesting a review of NYNEX's decision. *See* Ludwig Aff., Exh. M. In a letter dated January 15, 1990, Donovan responded that he would forward the letter of November 10, 1989 to Susan Kotulak, then employed as Director of Management Employment. Plaintiff alleges that neither he nor his legal counsel received a response from Kotulak.

On March 29, 1990, plaintiff's counsel took a different approach, directing his written request for the reinstatement of Ludwig's AT & T benefits to AT & T. In a letter dated April 5, 1990, Rosanne T. Maglio, the Secretary of the AT & T Benefits Committee, replied that there was nothing that AT & T could do regarding this matter because, under the Mandatory Portability Agreement, AT & T was obligated to suspend Ludwig's pension upon learning of his acceptance of employment with NYNEX. Maglio further responded that since the pension assets attributable to Ludwig's account had been transferred to NYNEX, NYNEX was responsible for the payment of any future pension benefits.

On August 10, 1990, plaintiff commenced this action in the Southern District of New York. Plaintiff alleges that defendants violated ERISA by wrongfully denying plaintiff his right to the immediate receipt of pension benefits and other benefits through their decision to declare plaintiff portable, and seeks the following relief: (a) reinstatement and payment of the monthly pension stipend of $1,701.60, retroactive to September 1, 1989, for plaintiff's life, together with interest on any unpaid pension benefit accrued from the date that such payment became due; (b) the right to participate in the NYNEX Pension Plan and the other NYNEX benefit plans as a "new employee;" (c) the right to receive the medical, life insurance and telephone concession benefits plaintiff was receiving prior to September 1, 1989; and (d) an award of reasonable attorney's fees, costs and other relief that is deemed reasonable and necessary by the Court pursuant to 29 U.S.C. § 1132(g)(1) (1988). Plaintiff also seeks recovery from all of the defendants under the common-law theory of promissory estoppel and requests the following relief: (a) payment of $1,701.60 per month, plus cost of living adjustments, for each month, retroactive to September 1, 1989, for the full period of plaintiff's past, present and future employment with NYNEX and for the rest of his life, plus interest accrued from the date that each past payment became due; (b) compensation for medical insurance premiums paid by plaintiff to procure medical insurance coverage for his dependent daughter; (c) the payment, for the remainder of plaintiff's life, retroactive to September 1, 1989, of premiums for term life insurance in the face amount of $57,000.00; and (d) reimbursement for his loss of AT & T long-distance telephone concession benefits. In a third cause of action, for breach of contract,

---

22. In his deposition, Ludwig testified that, shortly after AT & T confirmed his portability status, he completed various insurance forms for the NYNEX personnel office to augment the benefits that he was receiving from NYNEX. *See* Ludwig Aff., Exh. G. at 83–84 (deposition of Roy A. Ludwig).

23. In his affidavit, Ludwig notes that, at this time, he had not been apprised of his appeal rights. *See* Ludwig Aff., at 12. Further, in his deposition, Ludwig testified that he was never provided with the NYNEX Summary Plan Description for the various NYNEX benefits plans. *See* Ludwig Aff., Exh. G, at 95–96 (deposition of Roy A. Ludwig).

against defendant NYNEX Service Company alone, Ludwig seeks recovery for the following items: (a) a monthly pension of $1,701.60, plus cost-of-living adjustments; (b) long-distance telephone reimbursements; (c) full, no-cost medical insurance coverage for plaintiff and his dependent daughter; and (d) the payment of premiums, retroactive to September 1, 1989, for term life insurance for the remainder of plaintiff's life.

The defendants now move for summary judgment, and offer several arguments in support of their application. First, defendants argue that they were required by both statute and private contract to make plaintiff's pension and other benefits portable, and that plaintiff, as a matter of law, does not have the ability to waive this right. Second, they argue that even if plaintiff, in the abstract, does have the ability to waive his portability rights, he failed to waive them in the instant case because either a waiver was not properly executed, or the waiver, to be effective, had to be in writing, pursuant to either ERISA or the statute of frauds. Further to this point, defendants also contend that the oral waiver or agreement concerning portability that plaintiff alleges would have required an amendment to the defendants' employee benefit plans. Third, defendants argue that even if plaintiff could prevail on its first two arguments, summary judgment should nevertheless be granted because plaintiff has failed to exhaust his administrative remedies under the applicable employee benefit plans. Fourth, the defendants argue that summary judgment is proper because an abuse-of-discretion standard applies for determining the defendants' liability as ERISA plan fiduciaries in this action, and plaintiff, as a matter of law, has been unable to establish an abuse of discretion through the affidavits and accompanying papers that he has submitted in opposition to the defendants' motion. Finally, defendants argue that summary judgment should also be granted with regard to plaintiff's estoppel claim because plaintiff is unable to establish that he reasonably relied upon the defendants' representations concerning plaintiff's portability rights.

## DISCUSSION

### A. MOTION TO AMEND ANSWER

Defendants seek to amend their answer to include the affirmative defense of the Statute of Frauds under New York State law. Federal Rule of Civil Procedure 15(a) provides that leave of the Court to amend a pleading "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The Second Circuit Court of Appeals has interpreted this rule "to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *See Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993) (citing *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981)). The Court finds that plaintiff is not prejudiced by the defendants' proposed amendment to their answer, and that the defendants have not proceeded in bad faith. Accordingly, defendants' motion to amend is granted.

### B. MOTION FOR SUMMARY JUDGMENT

#### I. Standards for Granting Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a district court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under this standard, summary judgment is proper if "viewing the record in the light most favorable to the nonmoving party, the evidence offered demonstrates that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." *Pension Benefit Guar. Corp. v. LTV Corp.,* 875 F.2d 1008, 1015 (2d Cir.1989) (internal quotations omitted), *rev'd on other grounds,* 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). In making this determination, the court's role is not to resolve disputed factual issues, but rather to reach a conclusion as to whether there exists "a genuine and material issue for trial." *Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1175 (2d Cir.1993).

The mere existence of disputed factual issues is not enough to defeat a motion for summary judgment. *See Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985) (per curiam). Rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). An issue of fact is "genuine" if it provides a basis for "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). With regard to materiality, the substantive law dictates which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)). This burden may be met by demonstrating that there is a lack of evidence to support the nonmoving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party satisfies this initial burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If the nonmoving party is unable to establish the existence of an element essential to its case on which it bears the burden of proof at trial, a genuine issue of material fact cannot exist "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552.

■ The above-stated standards for granting summary judgment apply to ERISA actions to the same extent as they do to other civil actions. *See Rodriguez–Abreu v. The Chase Manhattan Bank, N.A.,* 986 F.2d 580, 583 (1st Cir.1993); *Williams v. Caterpillar, Inc.,* 944 F.2d 658, 661 (9th Cir.1991) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 105, 109 S.Ct. 948, 951, 103 L.Ed.2d 80 (1989)); *Catania v. NYSA–ILA Severance Benefit Fund,* 91 Civ. 3262 (LBS), 1992 WL 176502, 1992 U.S.Dist. LEXIS 10985, at *13 (S.D.N.Y. July 15, 1992). In an action brought under ERISA, the contours guiding the court's disposition of the summary judgment motion are necessarily shaped through the application of the substantive law of ERISA. These substantive dimensions begin with a preliminary determination of whether the plaintiff has exhausted her administrative remedies under the applicable ERISA plan, or in the alternative, has raised a genuine issue of fact that could lead the Court to waive the exhaustion requirement. *See Kennedy v. Empire Blue Cross and Blue Shield,* 989 F.2d 588, 594 (2d Cir.1993). If this threshold hurdle is overcome, the Court then proceeds to analyze whether the plaintiff has presented a genuine issue of material fact under ERISA's comprehensive civil enforcement scheme. A genuine issue of material fact is not presented to the extent that the facts in controversy pertain solely to a state-law cause of action that is both preempted by ERISA, and without a corresponding remedy under federal law. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 57, 107 S.Ct. 1549, 1558, 95 L.Ed.2d 39 (1987). It is therefore in this light that the Court examines the record to determine whether any genuine issue of material fact exists in regard to Ludwig's claim that the defendants wrongfully suspended his retirement benefits.

## II. *Exhaustion of Remedies and Jurisdictional Basis for Review*

■ Defendants contend that summary judgment should be granted because plaintiff has failed to exhaust his administrative remedies under the applicable employee benefit plans. Plaintiff, in turn, argues that he was absolved from exhausting his administrative

remedies because such action would have been futile.

In construing Congress's intent in enacting section 503 of ERISA, 29 U.S.C. § 1133 (1988), which requires ERISA-covered benefit plans to provide internal dispute resolution procedures for participants whose claims for benefits have been denied, the courts have "developed the requirement that a claimant should ordinarily follow internal plan procedures and exhaust internal plan remedies before seeking judicial relief under ERISA." John H. Langbein & Bruce A. Wolk, Pension and Employee Benefit Law 588 (1990). The rationale for this requirement rests upon the strong federal interest in encouraging the private resolution of ERISA disputes so as "to minimize the number of frivolous ERISA lawsuits ... and [to] decrease the cost and time of claims settlement." *Makar v. Health Care Corp.*, 872 F.2d 80, 82–83 (4th Cir.1989). Although Congress has not articulated an exhaustion requirement within the text of ERISA, the courts have nevertheless insisted upon a showing that all plan remedies have been pursued, or that the facts justify a waiver thereof, as a jurisdictional essential for maintaining a claim for benefits in federal court. *See Kennedy v. Empire Blue Cross and Blue Shield*, 989 F.2d 588, 594 (2d Cir.1993); *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir.1989) (noting requirement that ERISA claimants exhaust remedies provided for by their plan).

Nevertheless, under the "futility doctrine," the courts, in certain factual settings, have waived the jurisdictional requirement that a claimant exhaust all of her administrative remedies under an ERISA-covered plan. *See Kennedy*, 989 F.2d at 594–95. The "futility doctrine" is perhaps best understood as a term of art that considers whether, in light of both the claimant's and the plan administrator's actions, it is *fair* to require the dismissal of the claimant's suit pending her reapplication for benefits in accordance with the procedures set forth in the summary plan description.

A survey of applicable case law reveals that the federal courts have invoked the futility doctrine, and have thereby waived exhaustion as a precondition for judicial review under ERISA, in the following circumstances: (1) where the claimant brings a claim under section 510 of ERISA, 29 U.S.C. § 1140 (1988), asserting that her employment has been wrongfully terminated by her employer in retaliation for her exercise of the rights granted to her under ERISA, *see Novak v. TRW, Inc.*, 822 F.Supp. 963, 969 (E.D.N.Y.1993) (plaintiff also maintained that he was never informed of the appeals process); *Corbett v. International Ass'n of Bridge, Structural and Ornamental Iron Workers*, 90 CV 4161, 1992 WL 178762, at *7, 1992 U.S.Dist. LEXIS 10990, at *17 (E.D.N.Y. July 14, 1992); *Lawford v. New York Life Ins. Co.*, 739 F.Supp. 906, 912–13 (S.D.N.Y.1990). *But see Byrd v. MacPapers, Inc.*, 961 F.2d 157, 160 (11th Cir.1992) (finding that district court did not abuse its discretion in finding that plaintiff failed to plead exhaustion of administrative remedies or impossibility); (2) where, for summary judgment purposes, there is a material issue of fact as to whether the claimant has "properly appealed" a denial of benefits through the specified administrative channels, *see Jonas v. The New York State Soc'y of Certified Public Accountants Ins. Plans*, CV 91–4399 (ADS), 1992 WL 390291, 1992 U.S.Dist. LEXIS 19159, at *10 (E.D.N.Y. Dec. 8, 1992); (3) where the plan has failed to respond to the claimant's, or the claimant's representative's, written request for a review of the plan's benefit eligibility determination, *see Ritzer v. National Org. of Indus. Trade Union Ins. Trust Fund*, 807 F.Supp. 257, 260 (E.D.N.Y.1992) (claim deemed to have been constructively denied on review pursuant to 29 C.F.R. § 2560.503–1(h)(4) (1990)); (4) where there is a material issue of fact as to whether the plaintiff was informed of the appeals process, *see Novak*, 822 F.Supp. at 969; *Clay v. ILC Data Device Corp.*, 771 F.Supp. 40, 45 (E.D.N.Y.1991); *Kreml v. Diamond Shamrock Corp.*, 701 F.Supp. 1400, 1403–04 (N.D.Ill.1988); *see also Lee v. The Prudential Ins. Co. of Am.*, 673 F.Supp. 998, 1003 (N.D.Cal.1987) (discretionary standard applied); (5) where the plan fiduciary has acted in bad faith, in breach of its fiduciary duties, *see Riggs v. A.J. Ballard Tire & Oil Co.*, No. 91–2130, 1992 WL 345584, at *2,

1992 U.S.App. LEXIS 31134, at *5 (4th Cir. 1992); *Healy v. Axelrod Constr. Co. Defined Benefit Pension Plan and Trust,* 787 F.Supp. 838, 842 (N.D.Ill.1992); and (6) where the plan no longer exists. *See Hutchinson v. Wickes Cos.,* 726 F.Supp. 1315, 1321 (N.D.Ga.1989).[24]

Turning to the facts of the case at hand, the Court concludes that plaintiff has demonstrated that he falls within the purview of the futility doctrine, and that the Court, therefore, may analyze the substantive merits of his claims. The record reveals that on four separate occasions, Ludwig directed inquiries to NYNEX personnel requesting the reinstatement of his pension. The last two of these inquiries were in writing. NYNEX failed to inform Ludwig of his appeal rights, at any time, in response to Ludwig's requests. In addition, NYNEX failed to respond to plaintiff's counsel's letter to Robert Donovan, NYNEX's Managing Director of Personnel, dated November 10, 1989, which requested a review of NYNEX's portability decision.[25] Furthermore, a genuine issue of fact exists as to whether the NYNEX defendants provided Ludwig with the applicable summary plan descriptions, as required by section 102 of ERISA, 29 U.S.C. § 1022 (1988). These summary plan descriptions spell out, in plain language, the procedures for filing a claim under each of the NYNEX plans.[26] All of these facts, considered together, militate in favor of the Court's examination of the substantive merits of the plaintiff's claims. *See Novak,* 822 F.Supp. at 969 (futility doctrine invoked where genuine issue of fact existed as to whether claimant informed of appeal rights); *Clay,* 771 F.Supp.

at 45 (same); *Kreml,* 701 F.Supp. at 1403–04 (same); *see also Ritzer,* 807 F.Supp. at 260 (claim deemed constructively denied on review, pursuant to 29 C.F.R. § 2560.503–1(h)(4) (1990), where plan failed to respond to claimant's request for review of plan's benefit eligibility determination). *Cf. Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 144, 105 S.Ct. 3085, 3091, 87 L.Ed.2d 96 (1985) (construing the Regulations promulgated by the Secretary of Labor within 29 C.F.R. § 2560.503–1(h)(1)(i) (1984)—which establish a 120-day maximum period, including extensions, for the processing of a benefits claim—to imply that a claim will be regarded as denied upon the expiration of a 60-day or 120-day period). Therefore, this threshold hurdle having been surmounted, the Court now turns to analyze the substantive merits of plaintiff's claims.

## III. Review of NYNEX Benefits Eligibility Determination

Plaintiff argues that the defendants wrongfully suspended his pension and other benefits that he was receiving from AT & T and seeks the restoration of these benefits, and the enforcement and the clarification of his rights under the terms of the NYNEX employee benefit plans, pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (1988 & Supp. II 1990).[27] The defendants, in turn, contend that they were merely acting in compliance with the controlling plan documents which incorporate by reference the Mandatory Portability Agreement, to which Ludwig contractually assented through his execution of a release. Accordingly, the Court now endeavors to examine the rights

---

24. The federal courts have waived the exhaustion requirement in other fact-specific circumstances as well. *See, e.g., Horan v. Kaiser Steel Retirement Plan,* 947 F.2d 1412, 1416 (9th Cir.1991) (plan administered by Pension Benefit Guaranty Corporation [PBGC] which unequivocally stated in its amicus brief that beneficiaries were not entitled to annuities under terms of plan).

25. In a letter dated January 15, 1990, Donovan responded that he would forward the letter of November 10, 1989 to Susan Kotulak, then employed as Director of Management Employment. Plaintiff alleges that neither he nor his legal counsel received any response from Kotulak.

26. The record reveals, and plaintiff does not contest, that plaintiff did not file a formal claim for benefits with the NYNEX benefits office under any of the NYNEX plans at any time between August 18, 1988 (the date that Ludwig commenced employment with NYNEX) and October 16, 1991. *See* Tyler Aff. ¶ 8, at 3.

27. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (1988) provides as follows:
 A civil action may be brought—(1) by a participant or beneficiary—(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

of the parties under the applicable plan documents to determine whether the defendants incorrectly suspended Ludwig's pension. This examination, in turn, requires an analysis of the legal relationship between Ludwig and the defendants, and further involves a threshold determination of the appropriate standard of judicial review to be applied to the decisions of the NYNEX plan fiduciaries. The Court concludes that even though no deference is owed to the defendants in regard to their benefits eligibility decisions, the defendants were correct, pursuant to the terms of the NYNEX Management Pension Plan, in suspending the benefits that Ludwig was receiving from AT & T.[28]

### A. Scope of Judicial Review

The fundamental divide in the scope "of judicial review is between deferential and nondeferential review, that is, between reversing a tribunal's decision because it is unreasonable and reversing it merely because it is wrong." *Van Boxel v. The Journal Co. Employees' Pension Trust,* 836 F.2d 1048, 1052 (7th Cir.1987). Before examining the merits of the defendants' decision to suspend Ludwig's pension, the Court must ascertain whether it will review this decision *de novo*—that is, without any deference to the conclusions of law or fact that the defendants reached—or under the deferential arbitrary-and-capricious standard. The Court concludes that a *de novo* review applies in the instant case.

In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956–57. Citing "established principles of trust law" as the basis for its pronouncement, *id.,* the Court reversed the then-prevailing view of ERISA jurispru-

---

**28.** The Court notes that in his first cause of action, plaintiff's complaint asserts that "[t]he actions of NYNEX constitute a violation of the Employee Retirement Income Security Act, 29 U.S.C. 1001, *et seq.*" Complaint ¶ 19. The remedies that plaintiff seeks in this count are limited to those remedies set forth under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (1988) insofar as they seek "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (1988). Of significance, although plaintiff asserts a "violation of ERISA," he does not allege that any of the NYNEX plan administrators violated the fiduciary duties that they owed to the plan. The Court notes briefly, that even if plaintiff had asserted such a claim, it would not have created a genuine issue of material fact. This is so because in *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Supreme Court held that ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) (1988) does not permit a *private* cause of action asserting a breach of fiduciary duty (under ERISA Section 409, 29 U.S.C. § 1109 (1988)) to be brought by a beneficiary who alleges injury caused by an improper or untimely processing of a benefits claim. *See Russell,* 473 U.S. at 136, 148, 105 S.Ct. at 3087, 3093. Rather, under *Russell* and its progeny, a plan participant or beneficiary is only allowed to bring a claim asserting that a plan fiduciary has breached his fiduciary duties if he brings such claim on behalf of the plan. *See id.* at 144, 105 S.Ct. at 3091 ("[T]he entire text of § 409 [which establishes liability for breach of fiduciary duty] persuades us that Congress did not intend that section to authorize any relief except for the plan itself."); *Donnelly v. The Bank of N.Y. Co.,* 801 F.Supp. 1247, 1253–54 (S.D.N.Y.1992) (citing *Russell* for proposition that an action under ERISA for breach of fiduciary duty can only be maintained on behalf of the plan itself, and not by an individual beneficiary on her own behalf). *See also Russell,* 473 U.S. at 140, 105 S.Ct. at 3089 (recovery under ERISA for breach of fiduciary duty inures to benefit of plan as a whole, not individual claimant). Underlying these rulings is the recognition that the duties that ERISA imposes upon plan fiduciaries under ERISA §§ 401–414, 29 U.S.C. § 1101–1114 (1988 & Supp. II 1990) run only to the plans they administer, and not to the beneficiaries of such plans in their own regard. *See* ERISA § 409(a), 29 U.S.C. § 1109(a) (1988) ("Any person who is a fiduciary with respect to a *plan* who breaches any of the responsibilities, obligations or duties imposed upon fiduciaries by this title shall be personally liable to make good to such *plan*....") (emphasis added). There is little reason why these principles should not apply with equal force where, rather than alleging fiduciary improvidence in connection with the processing of a claim, the plaintiff alleges an unreasonable delay in connection with a fiduciary's decision to suspend a participant's pension in accordance with the plan documents. It therefore follows that Ludwig, as a matter of law, would be precluded from bringing a cause of action alleging a breach of the fiduciary duties imposed by ERISA.

dence,[29] and instituted the *de novo* standard as the default rule to guide the judicial review of a plan's denial of a claim for benefits.[30] According to the Supreme Court, the *de novo* standard would apply unless the plan granted discretionary authority to the plan fiduciary in making benefits eligibility decisions, in which event the arbitrary-and-capricious standard would generally govern. *See id.*[31]

A review of the applicable plan documents reveals that the benefit plans in question grant fiduciary discretion to make benefits eligibility decisions and to construe the terms of the plan. The NYNEX Management Pension Plan addresses the matter of fiduciary discretion in benefit eligibility determinations in three separate instances. Section 3.3(c) of the Plan provides:

> Any participant whose claim for benefits has been denied shall be notified, and shall have such further rights of review as are provided in Section 503 of [ERISA] and [the] regulations promulgated thereunder, and the [Employee Benefits] Committee, Participating Company Committees or any Departmental or Local Benefit Committee,

as applicable, appointed by them *shall retain such right, authority and discretion as is provided in or not expressly limited by said Section 503 of [ERISA] and the regulations thereunder.*

NYNEX Management Pension Plan § 3.3(c) (emphasis added).[32] In addition, section 3.4 of the Plan provides that "[t]he Committee shall determine *conclusively for all parties all questions arising in the administration of the Plan* and any decision of such Committee shall not be subject to further review." *Id.* § 3.4 (emphasis added). Further, section 6.3(a) of the Plan provides that "[i]n all questions ... relating to term of employment and rates of pay for determining service pensions and other benefits, *the decision of the Committee,* as applicable, based upon this Plan and upon the records of the Participating Company last employing such individual and insofar as permitted by applicable law, *shall be final." Id.* § 6.3(a) (emphasis added). Moreover, while the summary plan description for the NYNEX Management Pension Plan does not contain similar enabling language, the NYNEX legal information guide that is applicable to each of the defendant

29. *See* John H. Langbein & Bruce A. Wolk, Pension and Employee Benefit Law 610 (1990) (noting that at the time of the *Bruch* decision, all of the federal circuits had adopted the arbitrary-and-capricious (A & C) standard for ERISA cases, and that the Third Circuit, in *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134 (3d Cir.1987), had undertaken to depart from the A & C standard only in conflict-of-interest cases).

30. The Court, in *Bruch,* expressly limited the scope of its opinion "to the appropriate standard of review in [29 U.S.C.] § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations." *Bruch,* 489 U.S. at 108, 109 S.Ct. at 953.

31. The *Bruch* Court did, however, leave the door ajar for an abrogation of the arbitrary-and-capricious standard in the event that a plan administrator or fiduciary operated under a conflict of interest. The *de novo* standard would then presumably apply even though the plan document expressly granted fiduciary discretion in the making of benefits eligibility decisions. *See Bruch,* 489 U.S. at 115, 109 S.Ct. at 956.

The disparity in the standard of review to be applied depending upon whether the plan contains an express grant of fiduciary expression may be explained, in policy terms, through the informational value that such a written grant of

discretion provides. An express provision granting fiduciary discretion puts the employees and their beneficiaries on notice as to their appeal rights under the plan. Although such provision lends itself to boilerplate language for inclusion in, not only the plan instrument, but also the summary plan description that must be furnished to each employee pursuant to section 102 of ERISA, 29 U.S.C. § 1022 (1988), these provisions are subject to arms-length negotiation between the employer and employee as part of the terms of employment, and ultimately will be reflected as an offsetting component of the compensation package.

32. ERISA § 503, 29 U.S.C. § 1133 (1988) requires that each ERISA-covered plan establish a claims procedure. The statute provides:

> In accordance with regulations of the Secretary, every employee benefit plan shall—(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

ERISA § 503, 29 U.S.C. § 1133 (1988).

employee benefit plans provides that "[i]f there [is] a difference between what [the summary plan description] describes and what's written in a plan document ..., the language in the plan document ... is controlling." Flaherty Aff., Exh. G, *Highlights of the Legal Information Section,* at 4.[33]

While the NYNEX Management Pension Plan's clear grant of fiduciary authority to determine eligibility for benefits and to interpret the provisions of the Plan would generally come within the exception to *Bruch,* and would thereby warrant the application of an arbitrary-and-capricious standard of review, the Court nevertheless concludes that a *de novo* standard of review applies because Ludwig's portability status turns on questions of law. Under the law of the Second Circuit, a *de novo* standard of review applies, notwithstanding grants of discretionary authority within the plan document, where the fiduciaries' benefits eligibility determinations rest upon their resolution of a question of law. *See Weil v. Retirement Plan Admin. Committee of the Terson Co.,* 913 F.2d 1045, 1048 (2d Cir.1990) (*de novo* standard of review applied, notwithstanding grants of fiduciary discretion within the plan document, to the plan administrator's determination of a question of law as to whether a partial termination of the plan had occurred). In accordance with *Weil,* and moreover, in light of the procedural posture of this case whereby the defendants move for summary judgment against the plaintiff, the Court finds that NYNEX's determination of whether Ludwig was eligible for portability of service credit under the Mandatory Portability Agreement sufficiently rests on interpreta-

tions of law so as to warrant a *de novo* standard of review.[34] Accordingly, the Court now turns to consider whether the NYNEX defendants were *correct* in suspending the benefits that Ludwig was receiving from AT & T. This issue necessarily involves an analysis of the legal relationship that exists between Ludwig and the NYNEX defendants.

### B. *Analysis of Legal Relationship between Ludwig and NYNEX Plans and Accuracy of Decision to Suspend Ludwig's Pension*

The analysis of the legal relationship between Ludwig and the NYNEX employee benefit plans begins with the settlement of the antitrust lawsuit brought by the United States Department of Justice against AT & T in 1982. The settlement resulted in AT & T's divestiture of the Bell System regional operating companies into eight separate and independent entities. Prior to the break-up of the Bell System, employees who changed jobs from one company within the Bell System to another were afforded full "portability" of their "accrued service credits;" that is to say, a change of jobs between companies within the Bell System did not result in a break-in-service for purposes of determining an employee's credited service under the Bell System's employee benefit plans. Instead, an employee's service credits were simply tacked on, or "bridged," from one Bell System company to another. *See McCamphill v. Nynex Corp.,* 92 Civ. 0862 (LJF), 1993 WL 118518, 1993 U.S.Dist. LEXIS 4831, at *1 (S.D.N.Y. Apr. 12, 1993).

Under the consent decree entered into by AT & T and the United States, the portability of certain employee benefits among the

---

**33.** The Court notes that the effective amendment date listed on the NYNEX Management Pension Plan document that the defendants have submitted in support of their motion is June 1, 1990. *See* Flaherty Aff., Exh. F. In addition, the effective date listed on the summary plan descriptions submitted by the defendants is May 1991. *See* Flaherty Aff., Exh. G. Plaintiff has not protested the fact that these documents bear effective dates subsequent to his commencement of employment with NYNEX on August 18, 1988. Therefore, the Court presumes that plaintiff has conceded that the material terms within these documents are substantially unchanged from the terms that existed upon plaintiff's commencement of employment.

**34.** Some district courts have endeavored to consider whether a *de novo* or an arbitrary-and-capricious standard of review should apply to the factual findings of an ERISA fiduciary with respect to a claim of estoppel. *See, e.g., Guisti v. General Elec. Co.,* 733 F.Supp. 141, 147 (N.D.N.Y.1990) (factual findings of an ERISA fiduciary held subject to a *de novo* review). The Court simply notes that it will treat the facts of this case as it would in any other civil action in which the defendants move for summary judgment against the plaintiff. Therefore, the Court grants no deference to the factual findings of the plan fiduciaries.

former Bell System companies was only extended for one year beyond the January 1, 1984 divestiture date—through December 31, 1984. *See United States v. Western Elec. Co.,* 569 F.Supp. 1057, 1094 n. 158 (D.D.C.), *aff'd sub nom. California v. United States,* 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983). While the Communications Workers of America tried to extend portability beyond this one-year period, Judge Greene refused to do so reasoning that:

> The phasing out of unlimited portability is ... a natural consequence of divestiture, for it would surely be inconsistent with the independence of the Operating Companies from AT & T and from one another to allow employees to rotate among them as freely as if these companies were related entities.

*Id.* at 1094. In response to this ruling, Congress passed section 559 of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 900–01 (1984) [hereinafter DEFRA] "to protect indefinitely the service credits of low and mid-level employees of the former Bell System should they transfer to another regional operator." *McCamphill,* 1993 WL 118518, 1993 U.S.Dist. LEXIS 4831, at *4. The statute covered only those employees of a Bell System company on December 31, 1983 who were (A) not in a supervisory position, as that term is defined by section 2(11) of the National Labor Relations Act (29 U.S.C. § 152(11) (1982)); or (B) who received an annual base pay of not more than $50,000, adjusted for percentage increases in the consumer price index since December 31, 1983. *See* DEFRA § 559(c)(3).

"Because the process of transferring the service credits and pension assets of an employee covered under [section 559 of DEFRA] required the regional companies to apply a consistent set of criteria, and because the [statute] was neither self-executing nor unambiguous," *McCamphill,* 1993 WL 118518, 1993 U.S.Dist. LEXIS 4831, at *4, the former Bell System companies, including AT & T and NYNEX, entered into an agreement as to how they would implement the statute. This agreement, entitled the "Mandatory Portability Agreement" [hereinafter MPA], went into effect as of January 1, 1985, and allows for the mutual reciprocal recognition of a covered employee's service credit from any pension plan or other employee benefit plan, by and from any company that was a signatory to this agreement. *See* MPA ¶ 2.1(a). It also provides for the transfer of pension obligations and assets between the signatory companies, as actuarially determined, as the means of effecting the interchange of the same. *See* MPA ¶ 3.1(a). The Mandatory Portability Agreement defines the term "covered employee" to mean "an employee or former employee of an Interchange Company [35] (A) who, on December 31, 1983 ... (iv) [ ] was in a position for which the annual base rate of pay for such employee was not in excess of $50,000 ... and (B) who, on or after January 1, 1985, commences employment with another Interchange Company in a covered position subsequent to terminating employment on or after December 31, 1983, (and whether or not such employee has an intervening period of employment with a non-covered company or another company) from a prior covered position with another Interchange Company." MPA ¶ 1.6.[36] The phrase "covered position" is defined to mean a "job title or position with an Interchange Company (i) which qualifies an employee to participate in either or both the pension or death benefit provisions of a Successor Plan to the Bell System Pen-

---

**35.** The Mandatory Portability Agreement defines an "Interchange Company" as a company that is a signatory to the Mandatory Portability Agreement. *See* MPA ¶ 1.19.

**36.** The Court construes this phrase to mean that an otherwise covered employee, as that term is defined in the Mandatory Portability Agreement, will *not* cease to be a covered employee simply because he is unemployed for any period of time between (i) his termination of employment in a covered position in one Interchange Company, and (ii) his commencement of employment in a covered position in another Interchange Company. This interpretation is consistent with the legislative history of section 559 of DEFRA. The Conference Agreement provides that "[e]ven if there is a break in service ... the eventual movement from the first entity subject to the modified final judgment to the second such entity is a 'change in employment' for purposes of this legislation." H.R.Conf.Rep. No. 861, 98th Cong., 2d Sess. 1152–53 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, 1840–41.

sion Plan ... or (ii) with respect to which the annual base rate of pay does not exceed an amount which equals $50,000 plus an amount which equals $50,000 multiplied by the cumulative percentage change, compounded on a monthly basis, in the consumer price index for the period from January 1, 1984 to the applicable termination date from or applicable employment date into such position." MPA ¶ 1.7.

The Court finds that the Mandatory Portability Agreement has been incorporated by reference into the NYNEX Management Pension Plan, and that the NYNEX Management Pension Plan requires the permanent suspension of a covered employee's pension provided that such employee has assented to participate in this Plan. Of utmost significance to the instant action, section 4.6(a) of the NYNEX Management Pension Plan, which is entitled "Treatment During Certain Periods of Subsequent Employment," provides in pertinent part:

*[E]mployment with any Participating Company or with any Interchange Company shall suspend the right of a retired employee or person receiving a deferred vested pension, or a person otherwise entitled to receive a service or deferred vested pension, to pension payments during the period he continues in such employment;* provided, however, that any such employee completes 40 or more hours of service in each applicable calendar month; and such suspension shall not apply to the pension of any employee who continues in employment or is reemployed after reaching Normal Retirement Age with or by any Participating Company unless such employee remains on or after January 1, 1987; and provided further, such suspension shall not apply to the pension of an employee who is employed or reemployed by a company other than the Company or a subsidiary of the Company.... *Any such suspension imposed in accordance with this Paragraph 6(a) shall constitute a permanent withholding of the amount so suspended.*

NYNEX Management Pension Plan § 4.6(a) (emphasis added). Also of significance to the instant action are sections 8.1 and 8.2 of the NYNEX Management Pension Plan. Sec-

tion 8.1(b) and (c) provide, respectively, for the transfer of service credit and plan assets, from one interchange company to another with respect to a covered employee. Section 8.2, entitled "Suspension of Pension Benefits," places limits on the amount of pension benefits that are to be suspended under section 4.6(a) of the Plan where the covered employee has attained normal retirement age while employed by a Participating Company. Section 2.16 defines the term "Normal Retirement Age" as follows:

Effective before January 1, 1987, the term "Normal Retirement Age" shall mean age 65. On or after January 1, 1987, the term "Normal Retirement Age" shall mean the *latest of* (i) the time an employee attains age 65, or (ii) in the case of an employee who commences participation in the Plan within five years before attaining age 65, the fifth anniversary of the time such employee commences participation in the Plan.

NYNEX Management Pension Plan § 2.16 (emphasis added).

Turning to the instant case, Ludwig is unable to present a genuine issue of fact that could support an allegation that he was not a covered employee under the Mandatory Portability Agreement, or that the NYNEX plan administrators misread the provisions of the NYNEX Management Pension Plan requiring the suspension of his pension. If Ludwig indeed assented to participate in the NYNEX Management Pension Plan, then the administrators of this Plan would be required in accordance with its terms—and therefore, in accordance with ERISA—to suspend Ludwig's pension. Thus, the Court must now consider whether Ludwig has assented to participate in this Plan.

The starting point for this analysis is the language of section 559 of DEFRA. This statute incorporates by reference the rights and obligations granted to both parties and non-parties alike under the Divestiture Interchange Agreement [hereinafter DIA], which provided for the portability of certain employee benefits among the former Bell System companies through December 31, 1984. *See Western Elec. Co.,* 569 F.Supp. at 1094 n.

158. Section 559(a) of DEFRA provides as follows:

EMPLOYEE PROTECTION—Notwithstanding any provisions of the divestiture interchange agreement to the contrary, in the case of any change in employment on or after January 1, 1985, by a covered employee, the recognition of service credit, and enforcement of such recognition, *shall be governed in the same manner and to [the] same extent as provided under the divestiture interchange agreement for a change in employment by a covered employee during calendar year 1984.*

DEFRA § 559(a) (emphasis added).

Ludwig was not a party to the DIA.[37] Nevertheless, the promises made by the signatory companies to the DIA run to his benefit insofar as he was an intended beneficiary of this agreement because he fell within the definition of a "covered employee" under the DIA.[38] Therefore, Ludwig's legal status under the DIA—and consequently, under section 559 of DEFRA—is that of a third-party beneficiary.

Ludwig's status as a third-party beneficiary under DEFRA § 559 was unmodified by the Mandatory Portability Agreement. Although he was not a party to the MPA, the promises made by the signatory companies to this agreement concerning the interchange of pension obligations likewise ran to Ludwig's benefit. That is to say, upon learning of these promises and assenting to them, Ludwig could enforce them through court action.

Ludwig is correct in arguing that he could elect to waive (i.e., not enforce) the third-party beneficiary rights granted to him under DEFRA § 559, and the Mandatory Portability Agreement. This conclusion is supported by the legislative history of DEFRA § 559, which evinces that Congress intended to treat parties and nonparties differently. With respect to parties, the Conference Agreement makes clear that Congress intended to bind them to their obligations under the DIA. In support of this conclusion,

the Conference Agreement provides that "in the case of any change in employment on or after January 1, 1985, by a covered employee, the recognition of service credit and the enforcement of such recognition, shall be governed in the same manner and to the same extent as provided under the divestiture interchange agreement for a change in employment by a covered employee during calendar year 1984." H.R.Conf.Rep. No. 861, 98th Cong., 2d Sess. 1151 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, 1839. The Conference Agreement further provides that "[a] covered employee can move from one entity subject to the modified final judgment to another such entity without losing service credit," and that "[t]he subject entity for which [a covered employee] is working ... *must* recognize the service credit he or she accumulated during employment with other subject entities." *Id.* at 1152, *reprinted in* 1984 U.S.C.C.A.N. at 1840 (emphasis added). Congress's intent, however, appears to have been different with respect to nonparties of the DIA. Pertinent to the analysis of whether Ludwig could waive the third-party rights conferred upon him by Congress, the Conference Agreement states as follows:

Nothing in this conference agreement is intended to limit benefits that are otherwise available to any individual under the provisions of the modified final judgment (including the divestiture interchange agreement), under applicable law, or otherwise. This includes, but is not limited to, rights under the Communications Act of 1934, as amended, and the Employee Retirement Income Security Act of 1974 (ERISA), as amended.

*Id.* at 1154, *reprinted in* 1984 U.S.C.C.A.N. at 1842. The Court regards this statement as demonstrative of Congress's intent to leave undiminished the rights of covered employees—including the right to refuse to assent to portability—under both the DIA and ERISA. This conclusion is further reinforced by the fact that, under ERISA, an

---

**37.** Both AT & T and NYNEX were parties to the DIA.

**38.** The Divestiture Interchange Agreement defines a "covered employee" to include any employee of a signatory company during calendar year 1984.

employee's decision to participate in an employee benefit plan—including a pension plan—is entirely voluntary. Indeed, an employee may elect not to participate in any employee benefit plan at all. *Cf.* John H. Langbein & Bruce A. Wolk, Pension and Employee Benefit Law 24 (1990) ("The private pension system is voluntary.") Further to this point, the Court notes that "ERISA require[s] almost no portability among single employer plans [such as the AT & T Pension Plan and the NYNEX Management Pension Plan], apart from the ... rollover option." *Id.* at 52.

Despite the Court's conclusion that Ludwig had the *right* to waive his third-party rights under DEFRA § 559 and the Mandatory Portability Agreement, the Court finds that Ludwig, in point of fact, has asserted these rights and has therefore become subject to the comprehensive federal regulatory net of ERISA. As earlier discussed, on August 1, 1988, Ludwig signed and dated a release whereby he assented to the portability of his pension pursuant to section 559 of DEFRA and the MPA. *See supra* note 11. The Court finds, as a matter of law, that this release constitutes an enforceable contract supported by consideration. In this release, Ludwig expressly acknowledged that "[i]f NYNEX [were to] rule that [he was a] covered [employee], [his] service [would] be bridged." *Id.*[39] In exchange for this acknowledgment, NYNEX implicitly promised (i) to determine Ludwig's portability status under DEFRA and the MPA, (ii) to bridge Ludwig's service if it ascertained that Ludwig was, in fact, eligible for portability of service credit, and (iii) to grant Ludwig one year of temporary net credited service as of his date of hire so that he could receive those employee benefits otherwise allowed a covered employee.[40] Insofar as this bargain relates to the administration of an employee benefit plan that is subject to ERISA, Ludwig's rights and remedies with respect to this bargain are limited to those allowed under ERISA. *See* discussion *infra.*

To summarize, the Court holds that (i) Ludwig, by executing the release, became subject to the portability decision of the NYNEX plan administrators, and that (ii) the NYNEX plan administrators were correct in suspending Ludwig's pension pursuant to the terms of the NYNEX Management Pension Plan. Accordingly, the Court will now consider to what extent, if any, Ludwig can escape the consequences of his execution of the release by asserting claims for breach of contract and estoppel.

IV. *Preemption of Ludwig's State–Law Claims and Examination of Available Analogous Claims Under Federal Common Law*

In addition to asserting claims under section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B) (1988), plaintiff asserts common-law causes of action under the substantive theories of breach of contract and promissory estoppel. Because these claims ask the Court to redress plaintiff's rights, under state law, with respect to employee benefit plans that Congress has regulated under ERISA, the Court must consider whether plaintiff's common-law causes of action are preempted by ERISA. Moreover, if ERISA preemption is indeed found, the Court must further determine to what extent, if any, plaintiff's state claims may be recharacterized as federal causes of action under the mantle of federal common law, and allowed in this light.

A. *ERISA Preemption and Application of Federal Common Law*

In an effort to federalize the regulation of employee benefit plans so as to attain national uniformity in the regulation of such plans, Congress included within section 514 of ERISA, 29 U.S.C. § 1144 (1988 & Supp. II 1990), an express preemption provision. *See Ingersoll–Rand Co. v. McClendon*, 498 U.S.

---

**39.** In this release, Ludwig also agreed to reimburse NYNEX for the costs of any benefits provided to him by NYNEX in the event that NYNEX determined that he was not a covered employee. *See supra* note 11.

**40.** Although NYNEX has breached this portion of the agreement by failing to extend provisional service credit to Ludwig, as discussed *infra*, Ludwig is unable to negate his assent to abide by NYNEX's determination of his pension rights.

133, 142, 111 S.Ct. 478, 484, 112 L.Ed.2d 474 (1990). ERISA section 514(a) provides that the provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan." ERISA § 514(a), 29 U.S.C. § 1144(a) (1988) (emphasis added). The rest of section 514 provides several exceptions to the general rule of preemption and further clarifies ERISA's preemptive scope.[41]

The Supreme Court has recognized that ERISA's preemption clause is "conspicuous for its breadth," its deliberately expansive language having been "designed to establish pension plan regulation as exclusively a federal concern." *Ingersoll–Rand,* 498 U.S. at 138, 111 S.Ct. at 482 (quotations omitted). In determining whether a state law "relates to" an employee benefit plan, the Supreme Court has invalidated state laws—which ERISA defines to include "all laws, decisions, rules, regulations, or other State action having the effect of law," ERISA § 514(c)(1), 29 U.S.C. § 1144(c)(1) (1988)—even though they have not conflicted with the substantive provisions of ERISA. Applying the phrase "relate to" in an extremely broad sense, the courts have determined that ERISA also preempts state laws, including state-law causes of action, that make reference in their written text to an ERISA plan, that are premised upon the existence of an ERISA plan, or that produce an indirect effect upon the administration or cost structure of an ERISA plan that is substantial enough to imperil the federal interest in plan uniformity. *See Ingersoll–Rand,* 498 U.S. at 139, 111 S.Ct. at 483 ("[A] state law may "relate to" a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect. Pre-emption is also not precluded simply because a state law is consistent with ERISA's substantive requirements.") (citations omitted); *see, e.g., Morgan Guar. Trust*

*Co. v. Tax Appeals Tribunal,* 80 N.Y.2d 44, 587 N.Y.S.2d 252, 257–58, 599 N.E.2d 656, 661–62 (1992) (ERISA preempts New York State real property transfer gains tax as it applies to transactions completed by an ERISA-covered plan, even though state tax law functions irrespective of the existence of a covered plan). Indeed, as the Ninth Circuit Court of Appeals has recently stated, ERISA's preemptive scope is perhaps best understood as providing an exclusive federal governance over certain relationships, such as "the relationship between plan and plan member, between plan and employer, between employer and employee ..., and between plan and trustee." *General Am. Life Ins. Co. v. Castonguay,* 984 F.2d 1518, 1521 (9th Cir.1993) (citing J. Daniel Plants, Note, *Employer Recapture of ERISA Contributions Made by Mistake,* 89 Mich.L.Rev. 2000, 2017 (1991)). Those state laws that the courts have spared from preemption, largely, have left these relationships undisturbed, or have not produced a sufficiently material economic impact upon an ERISA plan (e.g., through the imposition of a tax of general application) so as to materially disadvantage the administration of a plan in one state as compared to another. *See, e.g., Mackey v. Lanier Collection Agency & Serv.,* 486 U.S. 825, 837–38, 108 S.Ct. 2182, 2189–90, 100 L.Ed.2d 836 (1988) (sustaining against preemption a state garnishment statute of general application as it applied to an employee welfare benefit plan—employee welfare benefit plans, unlike pension plans, are not subject to the anti-alienation provisions of ERISA § 206(d)(1), 29 U.S.C. § 1056(d)(1) (1988)); *Aetna Life Ins. Co. v. Borges,* 869 F.2d 142, 147 (2d Cir.) (indirect economic and administrative effects [of Connecticut escheat law] upon ERISA plan not substantial enough to warrant preemption), *cert. denied,* 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989); *Firestone Tire & Rubber Co. v.*

---

41. ERISA's preemption provision lends itself to a four-step inquiry in determining whether a state law is preempted. First, a court must decide if a "state law" has been promulgated. Next, the court must determine whether the state law "relate[s] to" an ERISA-covered plan within the meaning of section 514(a). Once a court finds that a state law relates to the plan, the next question is whether the law is "saved from preemption" by one of ERISA's express exemption provisions set forth in section 514(b). Finally, if the state law falls within the insurance exemption under section 514(b)(2)(A)—that is, as a state law that "regulates insurance"—the court must ascertain whether the "deemer clause" of section 514(b)(2)(B) nonetheless renders such law preempted because the law is being applied to a self-funded plan.

*Neusser,* 810 F.2d 550, 556 (6th Cir.1987) (finding that municipal income tax of general application not preempted by ERISA because it had too "remote and peripheral" an effect upon employee benefit plans).

In recognition of the exclusive federal interest that Congress has reserved for the regulation of employee benefit plans, the Court concludes that plaintiff's common-law cause of action for breach of contract is preempted by ERISA. Turning, for a moment, to examine the nature of plaintiff's claim to observe to what extent, if any, it "relates to" an employee benefit plan, plaintiff does not allege with any degree of particularity what agreement has been breached. Presumably, plaintiff is referring to the agreement embodied in the release that he signed and dated on August 1, 1988 in which he acknowledged that "[if] NYNEX rules that I am covered, my service will be bridged."[42] *See supra* note 11. The sentence that precedes this statement reads "I acknowledge that NYNEX is granting me one year of temporary net credited service at date of hire so that I may receive benefits allowed a covered employee." Because the release was drafted by NYNEX, ordinary rules of contract construction, as applied through federal common law, warrant the conclusion that NYNEX, consistent with the release, concurrently agreed to grant Ludwig one year of provisional net service credit. *See Fischman v. Blue Cross & Blue Shield,* 775 F.Supp. 513, 515 (D.Conn.1991) (" 'The federal common law of rights and obligations under ERISA must embody common-sense canons of contract interpretation.' ") (quoting *Burnham v. Guardian Life Ins. Co. of Am.,* 873 F.2d 486, 489 (1st Cir.1989)). Presumably, plaintiff argues that defendants breached this contractual agreement by failing to provide plaintiff with one year of provisional net service credit, or for that matter, with

any service credit prior to the time of NYNEX's portability determination on June 27, 1989. This failure to do so is illustrated through both NYNEX's internal records which regarded Ludwig as a "new hire," and through NYNEX's refusal to allow Ludwig to rollover his AT & T Savings Plan proceeds into the NYNEX Savings Plan.[43] Plaintiff presumably argues that the defendants' violation of the clear terms of this agreement constituted a material breach of such agreement, thereby allowing him to rescind the release, or alternatively, constituted a nonmaterial breach for which damages would be available. If the release were rescinded, plaintiff would presumably argue that his assent to be governed by the Mandatory Portability Agreement was similarly negated, and that therefore (i) his allocated pension assets should be returned to AT & T, (ii) his AT & T pension should be reinstated, and (iii) the defendants should compensate him for any incidental and consequential injuries that plaintiff incurred. Plaintiff's consequential injuries would presumably include the interest cost attributable to the time value of money associated with receiving his monthly pension at a later date.

In *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), the Supreme Court expressly held that ERISA preempts state common-law suits for the improper processing of a claim for benefits by an ERISA-covered plan. The Court in *Pilot Life* found that common-law causes of action based on the improper handling of a claim by an ERISA plan "relate to" an employee benefit plan, and therefore fall under ERISA's preemptive scope. *See id.* at 47–48, 107 S.Ct. at 1552–53. Similarly, in *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), the Supreme Court held that ERISA

**42.** Alternatively, plaintiff may be referring to an agreement entered into subsequent to his execution of the release that modified, or waived, the release. Plaintiff, however, is unable to establish the presence of any such agreement. The issue of whether the defendants made some representation, other than a promise, which could serve as the basis for an estoppel-based claim is discussed separately *infra.*

**43.** As earlier discussed, as a result of this, Ludwig was subject to current taxation on that portion of the savings plan proceeds that had not been previously taxed. As Ludwig acknowledged in his deposition testimony, this consequence could have been avoided through plaintiff's timely rollover, within sixty days, of his AT & T Savings Plan proceeds into an Individual Retirement Account (IRA). *See* Ludwig Aff., Exh. G, at 58 (deposition of Roy A. Ludwig).

preempts a common-law claim seeking "lost future wages, mental anguish and punitive damages as a result of [an employer's alleged] wrongful discharge" of an employee from his employment to prevent the employee from exercising his rights under ERISA. *Ingersoll–Rand,* 498 U.S. at 136, 111 S.Ct. at 481 (quotations omitted). The Court in *Ingersoll–Rand* reasoned that ERISA preempted the cause of action because the claim was premised on the existence of an ERISA-covered pension plan. *See id.* at 140, 111 S.Ct. at 483. Similarly, Ludwig's cause of action for breach of contract seeks to rescind an agreement between the parties concerning plaintiff's coverage under NYNEX's employee benefit plans. As was the case in *Ingersoll–Rand,* "there simply is *no* cause of action if there is no plan." *Id.* at 140, 111 S.Ct. at 484 (emphasis in original). Therefore, Ludwig's common-law cause of action is preempted by ERISA in accordance with *Pilot Life* and *Ingersoll–Rand. See Kennedy v. Empire Blue Cross and Blue Shield,* 989 F.2d 588, 591 (2d Cir.1993) (citing *Pilot Life* for proposition that ERISA preempts state-law contract claims pertaining to the denial of benefits under employee benefit plans); *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 288 (2d Cir.1992) (holding that ERISA preempts common-law actions—in this case fraud—which merely amount to alternative theories of recovery for conduct that is already actionable under ERISA, noting that the exclusive remedy for improper conduct in such cases is under ERISA § 502(a)); *Smith v. Dunham–Bush, Inc.,* 959 F.2d 6, 8 (2d Cir.1992) (common-law contract and tort claims preempted by ERISA); *Sandler v. Marconi Circuit Technology Corp.,* 814 F.Supp. 263, 265 (E.D.N.Y. 1993) (ERISA preempts common-law claims of promissory estoppel, breach of contract, or fraud).

Ludwig's claim for breach of contract is moreover not resuscible under the construct of federal common law. As the above discussion has shown, the expansiveness of ERISA's preemption clause is so great that it leaves a regulatory vacuum as to the rights and obligations of ERISA plans, fiduciaries, non-fiduciaries, and employees and their beneficiaries where such matters are not directly addressed by the Act. Accordingly, the Supreme Court has held that the courts are to fill in the interstices of ERISA by developing "a federal common law of rights and obligations under ERISA-regulated plans." *Pilot Life,* 481 U.S. at 56, 107 S.Ct. at 1558; *see also Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 24 n. 26, 103 S.Ct. 2841, 2854 n. 26, 77 L.Ed.2d 420 (1983) (" '[A] body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans.' ") (quoting 120 Cong.Rec. 29,942 (1974) (remarks of Sen. Javits)); *Hashimoto v. Bank of Haw.,* 999 F.2d 408, 412 (9th Cir.1993) (recharacterizing state cause of action as a *federal* cause of action in light of the totality of ERISA's preemption provision) (citing *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 66–67, 107 S.Ct. 1542, 1547–48, 95 L.Ed.2d 55 (1987)). Nevertheless, "[t]he authority of courts to develop a 'federal common law' under ERISA is not the authority to revise the text of the statute." *Mertens v. Hewitt Assocs.,* —— U.S. ——, ——, 113 S.Ct. 2063, 2070, 124 L.Ed.2d 161 (1993) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989)). Further to this point, the Supreme Court has noted that "[t]he six carefully integrated civil enforcement provisions found in [ERISA] § 502(a) ... provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Metropolitan Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96 (1985) (emphasis in original).[44] Consequently,

---

44. Section 502(a) of ERISA, 29 U.S.C. § 1132(a) (1988 & Supp. II 1990) provides as follows:

A civil action may be brought—
(1) by a participant or beneficiary—
(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title [ERISA § 409];

courts have "been extremely reluctant to find that ERISA creates certain causes of action by implication in addition to those enumerated in the statute itself." *UIU Severance Pay Trust Fund v. Local Union No. 18–U*, 998 F.2d 509, 512 (7th Cir.1993); *see Diduck*, 974 F.2d at 281 ("Broadening rights provided in a statute under the guise of federal common law should only be undertaken with great caution and where it 'will vindicate an important statutory policy.'") (citation omitted). In light of these concerns—and the recognition that a breach-of-contract claim asserts the existence of an agreement entered into by or on behalf of an ERISA plan, the enforcement of which could undermine the actuarial soundness of the plan and therefore subvert Congress's goal of promoting "the interests of employees and their beneficiaries in employee benefit plans," *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 137, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990)—it is not surprising that none of the courts that have found ERISA to preempt a state-law breach-of-contract claim have allowed such claim to be reasserted under the namesake of federal common law. (*See* cases cited *supra.*)

■ Accordingly, in the case at bar, the Court's examination of the carefully crafted civil enforcement provisions of ERISA § 502 warrants the conclusion that Congress did not intend to allow claimants to pursue breach-of-contract claims through the backdoor of federal common law. *See Ingersoll–Rand*, 498 U.S. at 138, 111 S.Ct. at 482 ("'The purpose of Congress is the ultimate

touchstone.'") (quoting *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 208, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985)). "Allowing state based actions like the one at issue here would subject plans and plan sponsors to burdens ... that Congress sought to foreclose through [section] 514(a)." *Ingersoll–Rand*, 498 U.S. at 142, 111 S.Ct. at 484. Thus, the Court refuses to allow plaintiff to proceed with his preempted claim for breach of contract under the guise of federal common law.

## B. *Plaintiff's Estoppel Claim*

■ Although plaintiff's state-law estoppel claim is similarly preempted by ERISA,[45] the Second Circuit Court of Appeals has "recognized that under 'extraordinary circumstances' principles of estoppel can apply in ERISA cases" under the veneer of federal common law. *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir.1993) (citations omitted). At the heart of Ludwig's estoppel claim is his argument that he reasonably relied upon representations made to him by NYNEX personnel regarding his continued ability to receive his AT & T pension benefits. Because these alleged representations concern Ludwig's entitlement to benefits from an ERISA plan and implicate his reliance upon such representations, plaintiff's cause of action for estoppel is premised upon the existence of an ERISA plan in consonance with *Ingersoll–Rand*, and is therefore preempted by ERISA. *See Ingersoll–Rand*, 498 U.S. at 140, 111 S.Ct. at 483. *See also Russo v.*

(3) by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

(4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of [section] 1025(c) of this title;

(5) except as otherwise provided in subsection (b) of this section, by the Secretary (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter; or

(6) by the Secretary to collect any civil penalty under subsection (i) of this section.

45. Ludwig, in his affidavits and exhibits in opposition to the defendants' motion for summary judgment, is unable to present evidence of a single *promise*—that is, a commitment—that any of the defendants or their employees made to him concerning his portability status. It is well established that a promise must be shown in order to invoke the doctrine of promissory estoppel. *See* Edward Yorio & Steve Thel, *The Promissory Basis of Section 90*, 101 Yale L.J. 111, 122 (1991) (citations omitted). Accordingly, in order to give full effect to plaintiff's legal rights in connection with the defendants' motion for summary judgment, the Court will analyze plaintiff's estoppel claim under the doctrine of equitable estoppel, which, unlike promissory estoppel, does not require the existence of a promise. *See id.*

*Health, Welfare & Pension Fund, Local 705,* 984 F.2d 762, 767 (7th Cir.1993) (state-law estoppel claims are preempted by ERISA, and, as a general rule, the use of estoppel principles to alter ERISA plans is precluded because ERISA does not recognize oral modifications of a written benefit plan); *Reeher v. Baker Material Handling Corp.,* No. 92–3244, 1993 WL 220559, at *12, 1993 U.S.App. LEXIS 16142, at *35 (6th Cir. June 23, 1993) (promissory estoppel claims are for the recovery of an ERISA plan benefit and accordingly are preempted by ERISA); *Kraut v. Wisconsin Laborers Health Fund,* 992 F.2d 113, 117 (7th Cir.1993) ("estoppel principles cannot be applied ... to vary the written terms of [a] health care plan"); *Hughes v. K Mart Corp.,* No. 92–1396, 1993 WL 11830, at *8, 1993 U.S.App. LEXIS 1333, at *24–*25 (6th Cir. Jan. 20, 1993) (ERISA preempts promissory estoppel and misrepresentation claims); *Pohl v. National Benefits Consultants,* 956 F.2d 126, 128 (7th Cir.1992) (ERISA preempts common-law estoppel remedies and provides no remedies of its own where a nonfiduciary plan administrator misrepresents the scope of coverage); *Peckham v. Gem State Mut.,* 964 F.2d 1043, 1051 (10th Cir.1992) (promissory estoppel claim preempted); *Farlow v. Union Cent. Life Ins. Co.,* 874 F.2d 791, 793 (11th Cir.1989) (misrepresentation claim preempted); *Daniel v. Eaton Corp.,* 839 F.2d 263, 266 (6th Cir.) (promissory estoppel claim preempted), *cert. denied,* 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988); *Sandler v. Marconi Circuit Technology Corp.,* 814 F.Supp. 263, 265 (E.D.N.Y.1993) (ERISA preempts common-law claims of promissory estoppel).

Nevertheless, in filling in the interstices of ERISA, the Second Circuit Court of Appeals has acknowledged that estoppel-based claims may be allowed under federal common law in "extraordinary circumstances." *See Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993) (estoppel claim denied) (citing *Chambless v. Masters, Mates & Pilots Pension Plan,* 772 F.2d 1032, 1039 (2d Cir.1985) (arbitrary and capricious amendment to plan held to be without legal effect), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1189, 89 L.Ed.2d 304 (1986)); *see, e.g., Fortune v. Medical Assocs.,* 803 F.Supp. 636, 642 (E.D.N.Y.1992) (federal

common law of estoppel applied to prevent insurer from asserting defense of ineligibility of coverage); *see also Gridley v. Cleveland Pneumatic Co.,* 924 F.2d 1310, 1318–19 (3d Cir.) (claim for equitable estoppel is available under ERISA section 502(a)(3) under the nomenclature of "appropriate equitable relief" in "extraordinary circumstances"), *cert. denied,* —— U.S. ——, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991). *Cf. Donnelly v. The Bank of N.Y. Co.,* 801 F.Supp. 1247, 1253 (S.D.N.Y.1992) ("[C]ourts are reluctant to apply the estoppel doctrine to require the payment of pension funds because the actuarial soundness of pension funds is, absent extraordinary circumstances, too important....") (internal quotations omitted). Accordingly, the Court shall address whether the circumstances of the instant case, including NYNEX's failure to provide Ludwig with provisional service credit in accordance with the terms of the release, create a genuine issue of fact as to whether the defendants may be estopped from asserting the existence of Ludwig's release. The Court finds that plaintiff is unable to demonstrate the existence of a genuine issue for trial.

Plaintiff's equitable claims that seek to avoid the effect of the release fall into two general categories: (a) those claims that assert the existence of a defect in contract formation; and (b) those claims that assert that the release, although valid *ab initio,* should be adjudged voidable by the Court because of the defendants' subsequent representations and conduct. For purposes of examining Ludwig's rights under ERISA, each of these two categories of claims may be further subdivided through an analytical framework founded upon the well-established principles of contract law. *See Fischman v. Blue Cross & Blue Shield,* 775 F.Supp. 513, 515 (D.Conn.1991) (" 'The federal common law of rights and obligations under ERISA must embody common-sense canons of contract interpretation.' ") (quoting *Burnham v. Guardian Life Ins. Co. of Am.,* 873 F.2d 486, 489 (1st Cir.1989)). Accordingly, the Court will analyze Ludwig's attacks on the contractual formation of the release through the rubrics of (1) estoppel and (2) unilateral mistake. Further, the Court will analyze Lud-

wig's request for relief from the continued enforcement of the release under the doctrines of (3) waiver and (4) modification. Under each of these frameworks of analysis, the Court concludes that Ludwig fails to present a genuine issue of fact so as to preclude the Court's granting of summary judgment to the defendants.

### 1. *Estoppel*

██ On the basis of estoppel, Ludwig argues that the defendants should not be allowed to enforce the release because his execution of the release was induced through representations made to him by NYNEX's employees that lead him to believe that his execution thereof would have no legal effect.

██ Under the law of the Second Circuit, the elements of estoppel are (1) a representation of material fact, (2) reliance by the aggrieved party thereon, and (3) injuries resulting from such reliance. *See Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993) (citing *Gridley v. Cleveland Pneumatic Co.,* 924 F.2d 1310, 1319 (3d Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991)). Each of these elements must be established to make out a claim of estoppel. *See Lee,* 991 F.2d at 1009. Plaintiff is unable to demonstrate the existence of the second element. Accordingly, the Court refuses plaintiff's invitation to void the release on this basis.

The Court concludes on the basis of the record before it that a reasonable trier of fact could not find that Ludwig executed the release in reliance upon any representation, or ambiguous statement, made by the defendants or their employees. Ludwig's allegation that, at his interview with Charles White at NYNEX's offices on July 21, 1988, White told Ludwig that all new employees, whether or not eligible for portability, signed the release and that this action constituted a mere matter of procedure without substantive effect, *see* Ludwig Aff. at 5, is not enough to satisfy the Court. In this regard, the Court finds most compelling Ludwig's own deposition testimony in which he declared, under oath, that approximately one or two days *after* his interview with Charles White, he sent a letter to the secretary of the benefits

committee at *AT & T* in which he expressed concern about the Mandatory Portability Agreement because he was aware that he met the criteria for being a covered person thereunder. *See supra* note 10. Ludwig, by his own conduct, therefore manifests that he had not relied upon any statements made by NYNEX or its employees as of the time that he mailed this letter to AT & T. He further manifests that he did not regard White's alleged statements to be promissory. *See supra* note 45. Given that Ludwig does not allege that he had any further discussions or correspondences with NYNEX personnel between approximately July 22, 1988, the date that he mailed the letter to AT & T, and August 1, 1988, the date that he executed the release, the Court finds plaintiff's assertion that he relied upon the defendants' representations to be unpersuasive. Therefore, on the basis of the record, the Court rejects plaintiff's claim of estoppel.

### 2. *Unilateral Mistake*

██ Under the construct of unilateral mistake, plaintiff argues that the Court should grant him relief on the basis that (i) plaintiff signed the release without knowing of its significance, and (ii) NYNEX either knew or should have known that Ludwig was mistaken as to the legal effect of the release. *See Bituminous Coal Operators' Ass'n v. Connors,* 867 F.2d 625, 632 (D.C.Cir.1989) (using unilateral mistake-of-fact analysis in an ERISA case).

██ It is well settled that in order for a court to allow rescission of a contract on the basis of a unilateral mistake, a party must establish that (i) he entered into a contract under a mistake of material fact, and that (ii) the other contracting party either knew or should have known that such mistake was being made. *See, e.g., United States v. Metro Novelty Mfg. Co.,* 125 F.Supp. 713, 713–14 (S.D.N.Y.1954) (summary judgment granted to defendant where defendant claimed a mistake in the computation of a bid, and plaintiff admitted that the error was so gross as to place it on notice). Plaintiff is unable to demonstrate the existence of a genuine issue of fact as to either of these elements. Accordingly, the Court refuses to deny sum-

mary judgment to the defendants on this basis.

Ludwig's argument for unilateral mistake, in essence, asserts that (a) despite his refusal to sign the release at the time of his interview at NYNEX's offices on July 21, 1988 because he was aware of its legal significance, and (b) despite the fact that he shortly thereafter wrote and dispatched a letter to AT & T, his former employer, because he was concerned that he met the criteria for portability as such criteria were described in the release, (c) he nevertheless did not know what he was doing when he signed the release on August 1, 1988. Furthermore, Ludwig argues that NYNEX either knew or should have known that Ludwig did not know what he was doing when he signed the release. Simply put, Ludwig's request for relief on the basis of unilateral mistake is "a lot of wood to chop."

3. *Waiver*

 Ludwig seeks to attack the continued enforcement of his release on the basis of waiver, arguing that NYNEX has intentionally relinquished its right to bind Ludwig to his acknowledgment that he would abide by NYNEX's portability determination. While the doctrine of waiver is applicable to ERISA cases as a matter of federal common law, *see, e.g., Masella v. Blue Cross & Blue Shield,* 936 F.2d 98, 107–08 (2d Cir. 1991) (affirming district court's conclusion that plan administrator had waived its contractual rights by failing to assert them in a timely fashion), plaintiff's claim that NYNEX waived its right to enforce Ludwig's release is unavailing under the facts of this case.

"Waiver arises when a party has voluntarily or intentionally relinquished a known right." *Hedspeth v. The Citicorp Individual Bank Retirement Plan,* 91 Civ. 1471 (SS), 1993 WL 204808, 1993 U.S.Dist. LEXIS 7595, at *55 (S.D.N.Y. June 3, 1993) (citing *Vershaw v. Northwestern Nat'l Life Ins. Co.,* 979 F.2d 557, 560 (7th Cir.1992)). Generally speaking, a "waiver" need not be supported by consideration, but not being an otherwise binding agreement, it can be revoked unless it has been relied upon. *See* Lon L. Fuller & Melvin Aron Eisenberg, Basic Contract Law

157–58 (5th ed. 1990). In addition, only conditions that are "ancillary" or "collateral" to the transaction can be waived. Conditions that are crucial to the original bargain cannot be waived in the absence of fresh consideration or a consideration substitute such as promissory estoppel. *See id.* at 158; *Clark v. West,* 193 N.Y. 349, 86 N.E. 1, 5 (1908).

Plaintiff is unable to establish that the defendants voluntarily or intentionally relinquished their right to enforce Ludwig's contractual obligation to abide by NYNEX's portability determination. Plaintiff's affidavits and supporting exhibits in opposition to defendants' motion are unable to present the Court with a single shred of evidence of any promise, offer, or declaration that was made by any of the defendants, or their employees, *to Ludwig* regarding plaintiff's ability to have his pension regarded as non-portable, notwithstanding his prior execution of the release. Any alleged inconsistencies within NYNEX's internal records—which plaintiff, moreover, does not allege that he even became aware of prior to his commencement of the instant action—is not, as plaintiff contends, tantamount to the intentional relinquishment of a known right. *See Hedspeth,* 1993 WL 204808, 1993 U.S.Dist. LEXIS 7595, at *55.

Further, the Court does not imply waiver from the fact that the defendants took more than ten months in making their portability determination, and that, as a result of this, and because of NYNEX's failure to extend Ludwig provisional service credit in accordance with the terms of the release, plaintiff was unable to participate in the NYNEX benefits package. This conclusion is reinforced by the fact that neither the plan document, the summary plan description, nor the release that Ludwig executed mandated a specific time frame for the determination of Ludwig's portability status. Accordingly, the Court implies that the time frame for the determination of Ludwig's portability status was *a reasonable time.* In light of (i) the complexity of the legal issues upon which the determination was predicated, (ii) Ludwig's repeated iterations to NYNEX personnel of his desire to reverse what he had acknowledged in the release, and (iii) the complete

absence of any unremediable material injury suffered by Ludwig as a result of this delay—he continued to receive his full benefits package from AT & T during this period— the Court does not regard as unreasonable the fact that the defendants took more than ten months to make their portability determination.

In addition, the Court notes that plaintiff's promise that he would abide by NYNEX's portability determination is precluded from being waived in this instance. Ludwig's promise does not constitute a condition that is merely ancillary or collateral to the contract embodied in the release. Rather, it represents the very essence of the bargain whereby NYNEX concurrently promised (i) to ascertain plaintiff's portability status, (ii) upon such determination, to administer Ludwig's pension obligation, and (iii) to provide Ludwig with one year of provisional net credited service pending NYNEX's portability determination. *See* Fuller & Eisenberg, *supra*, at 158. Accordingly, Ludwig's promise to abide by NYNEX's determination cannot be waived in the absence of fresh consideration or a consideration substitute such as estoppel.

Lastly, the Court refuses to find that the defendants, through their failure to honor their contractual obligation to extend one year of provisional net credited service to Ludwig, waived Ludwig's promise to abide by NYNEX's portability determination. Again, a finding of waiver is unavailing in view that Ludwig's promise was seminal to the contract of release and NYNEX, at no time, manifested to Ludwig an intent to relieve him from his contractual undertakings. Furthermore, any argument that Ludwig was excused from honoring his release, under the doctrine of constructive conditions, as a result of NYNEX's failure to honor its reciprocal promise to provide Ludwig with provisional net credited service, is similarly unavailing. This argument, in essence, constitutes a claim for breach of contract. As the Court has already discussed at great length, such claims are preempted by ERISA without any corresponding remedy under federal common law. *See supra.*

4. *Use of Oral Representations to Modify Terms of ERISA Plan*

■ Plaintiff also attacks the continued enforcement of the release by contending that the defendants, through representations that they made subsequent to plaintiff's execution of the release, lead him to believe that his pension would not be regarded as portable. The Court has already addressed Ludwig's claim of estoppel against the enforcement of the release on the basis of *defect in contract formation*, and has held that, while the law of this circuit permits such claims to be brought under extraordinary circumstances, the facts of the instant case clearly militated against the invocation of this doctrine. In contrast, this argument concerns the separate and distinct matter of whether the defendants should be equitably estopped from enforcing the release against Ludwig because of some representation that they made *subsequent to Ludwig's execution of the release.* The Court has already examined this question under the rubric of "waiver" and found plaintiff's argument to be without merit. The Court now turns to examine this question under the paradigm of modification. Under this analysis, the Court again finds plaintiff's claim to be unavailing. In this case, plaintiff's claim is precluded, not only under the facts of the instant action, but also as a matter of substantive law.

■ A modification is an agreement to abridge or amend an enforceable contractual duty under an existing agreement. Unlike a waiver, which does not have to be supported by fresh consideration and is revocable by the promisor in the absence of reliance by the promisee, a modification, in the context of contracts other than for the sale of goods governed by Article Two of the Uniform Commercial Code, requires fresh consideration, or a consideration substitute such as promissory estoppel, to bind the promisor. *See Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1285–86 (7th Cir. 1986) (contrasting common-law rule with U.C.C. § 2–209, pursuant to which an agreement modifying a sales contract needs no consideration to be binding provided that the modification is entered into in good faith); *Nassau Trust Co. v. Montrose Concrete*

*Prods. Corp.*, 56 N.Y.2d 175, 451 N.Y.S.2d 663, 667–68, 436 N.E.2d 1265, 1269–70 (1982).

Plaintiff is unable to establish a modification of the release. Plaintiff's affidavits and supporting exhibits fail to present the Court with any evidence whatsoever of any promise, or statement made *to plaintiff*, subsequent to *his* execution of the release, regarding plaintiff's portability status under the NYNEX employee benefit plans. Any alleged inconsistencies within NYNEX's internal records—which plaintiff, moreover, does not allege that he even learned of until he commenced this action—is not, as plaintiff contends, a proper basis for overriding the written terms of the NYNEX Management Pension Plan.

██ The use of estoppel to modify a valid contractual agreement, where such has the effect of overriding the written terms of an ERISA plan, is moreover precluded as a matter of federal common law. *See Sandler v. Marconi Circuit Technology Corp.*, 814 F.Supp. 263, 265 (E.D.N.Y.1993) (" 'requirement that ERISA plan be maintained in writing precludes oral modifications of the Plans; the common law doctrine of estoppel cannot be used to alter this result' ") (quoting *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir.1986)). Courts in the Second Circuit "have routinely rejected claims based upon oral promises which purport to vary the terms of a written ERISA plan." *Sandler*, 814 F.Supp. at 265; *see, e.g., Weingord v. Western Union World Communications, Inc.*, No. 89 Civ. 7288 (KMW), 1991 WL 90742, 1991 U.S.Dist. LEXIS 6963, at \*16 (S.D.N.Y. May 22, 1991) (Reliance upon "oral promises cannot modify written agreements under ERISA.") (citing *Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir.1988)). The courts have consistently interpreted section 402(a) of ERISA, 29 U.S.C. § 1102(a) (1988), which requires that "[e]very employee benefit plan ... be established and maintained pursuant to a written instrument," to support the rejection of claims that allege reliance upon representations concern-

ing a plan that are, in fact, contrary to the actual terms of the plan. As the Second Circuit Court of Appeals noted in *Smith v. Dunham–Bush, Inc.*, 959 F.2d 6 (2d Cir. 1992), "[t]he writing requirement [of 29 U.S.C. § 1102(a) (1988) ] protects employees from having their benefits eroded by oral modifications to [a] plan." *Id.* at 10. Further, the abrogation of the writing requirement through the use of estoppel would undermine the actuarial soundness of pension plans by subjecting them to the payment of benefits through court order to persons who are not entitled to such benefits under the express terms of the plans. *See id.* This would run contrary to Congress's purpose in enacting ERISA because it would place the interests of employees and their beneficiaries in employee benefit plans at risk due to the potential depletion of plan assets that could result through the imposition of plan liability. *See Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 137, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990); *Smith*, 959 F.2d at 10.[46] *See also Mertens v. Hewitt Assocs.*, — U.S. —, —, 113 S.Ct. 2063, 2065, 124 L.Ed.2d 161 (1993) (illustrating how the minimal assurances that ERISA provides through the establishment of the Pension Benefit Guaranty Corporation [PBGC] can pale financially in comparison to the potentially higher level of benefits *obtainable through the administra-*tion of a solvent ERISA pension plan).

There are two wrinkles on this doctrine against the use of estoppel to vary plan terms. Neither situation, however, is applicable to the case at bar. The first arises where the language of the plan is not clear, but rather ambiguous, and the plaintiff has relied upon an oral or written interpretation of an ambiguous plan term; in this case the courts have allowed estoppel claims to proceed under federal common law. *See, e.g., Nat'l Cos. Health Benefit Plan v. St. Joseph's Hosp.*, 929 F.2d 1558, 1572 (11th Cir.1991) (written interpretation of ambiguous plan term); *Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1285 (11th Cir.) (oral interpretation of ambiguous plan term), *cert. denied*, 498 U.S.

---

**46.** The Eleventh Circuit Court of Appeals has also noted that the rejection of oral modifications to plan documents reflects Congress's "concern for [certainty by] ensuring that beneficiaries are fully and clearly apprised of their rights and obligations under an ERISA plan." *Meadows v. Cagle's, Inc.*, 954 F.2d 686, 692 (11th Cir.1992).

890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990); *Gonyea v. John Hancock Mut. Life Ins. Co.,* 812 F.Supp. 445, 449 (D.Vt.1993) ("[U]se of the federal common law of waiver [to hold defendant to its interpretation of an ambiguous term] will not undermine the underlying purpose of ERISA.") (citing *Dardaganis v. Grace Capital, Inc.,* 889 F.2d 1237, 1241 (2d Cir.1989)). The second arises where there is a showing that is "tantamount to proof of fraud." *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488, 492 (2d Cir.1988). Insofar as plaintiff is unable to establish either situation in the instant case, the general rule prohibiting an alleged reliance on oral representations to modify the terms of an ERISA plan remains operative. Accordingly, as a matter of law, the Court refuses plaintiff's invitation to estop the defendants from enforcing the release that plaintiff, himself, validly executed.

In the final analysis, a thorough examination of the record reveals that plaintiff is unable to show the existence of a genuine issue for trial that is even remotely capable of justifying a finding of "extraordinary circumstances" so as to support a claim for equitable relief under the federal common law of ERISA. *See Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993). As the Court has discussed, plaintiff has been unable to present a genuine issue of material fact as to either the events leading up to his execution of the release, or as to the defendants' alleged subsequent representations to him. Accordingly, the Court finds that the granting of summary judgment in favor of the defendants is appropriate as to plaintiff's estoppel claim.[47]

## CONCLUSION

To summarize, while plaintiff has succeeded in presenting a genuine issue of material fact on the jurisdictional question of whether he should have exhausted plan administrative remedies, he has failed to establish a genuine and material issue for trial under the substantive law of ERISA. Proceeding under a *de novo* standard of review, the Court has concluded that the defendants' benefits eligibility decisions were in accordance with the provisions of the NYNEX Management Pension Plan, of which Ludwig became a participant through his execution of a release. Moreover, the Court concludes that plaintiff's claim that NYNEX breached its contractual obligations concurrent to plaintiff's release is preempted by ERISA without any corresponding remedy under federal common law. Finally, the Court concludes that plaintiff is unable to present a genuine and material issue for trial that could justify an award of equitable relief.

Defendants' motion to amend their answer is granted. Fed.R.Civ.P. 15(a). Defendants' motion for summary judgment is granted. Fed.R.Civ.P. 56(c).

SO ORDERED.

---

**47.** The Court notes that it regards the defendants' affirmative defense of the Statute of Frauds under New York law as being inconsistent with Congress's imprimatur for the courts to develop a federal common law of ERISA. In light of Congress's concern for not exposing plan administrators to conflicting state laws—which has been echoed most prominently by the Supreme Court in the *Ingersoll–Rand* and *Pilot Life* opinions—the Court rejects the defendants' invitation to apply a Statute-of-Frauds analysis under state law in the ERISA context. *See Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 484, 112 L.Ed.2d 474 (1990) ("Section 514(a) was intended to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of com-

plying with conflicting directives among States or between States and the Federal Government. Otherwise, the inefficiencies created could work to the detriment of plan beneficiaries.") (citations omitted); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) (citing 120 Cong.Rec. 29,933 (1974) (statement of Sen. Williams) ("[T]he substantive and enforcement provisions ... are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans.")). Rather, the Court regards the policies militating against a variance of the unambiguous terms of an ERISA plan by oral agreement as having been subsumed within the federal common-law doctrines of waiver and modification.