Paul **SIBLEY–SCHREIBER,** Sajid **Shah, Sheldon Friedman, and Edward Gallardo, on behalf of themselves and all other persons similarly situated, Plaintiffs,**

v.

**OXFORD HEALTH PLANS (N.Y.), INC., Oxford Health Insurance, Inc., John Doe Number 1, individually and in his fiduciary capacity as Plan Administrator of Oxford Health Plans (N.Y.), Inc., and John Doe Number 2, individually and in his fiduciary capacity as Plan Administrator of Oxford Health Insurance, Inc., Defendants.**

No. 98 CV 3671.

United States District Court,
E.D. New York.

Aug. 23, 1999.

Steven Cooper & Jordan W. Siev & Alan Arkin, Anderson Kill & Olick, P.C., New York City, Steven Fineman, Lieff, Cabraser, Heimann & Bernstein, LLP, New York City, Jaqueline E. Mottek, San Francisco, CA, Robert A. Swift & William E. Hoese, Kohn, Swift & Graf, P.C., Philadelphia, PA, for Plaintiffs.

Frederick E. Sherman & Jayant W. Tambe, New York City, Willis J. Goldsmith, Jones, Day, Reavis & Pogue, Washington, DC, Joseph L. Clasen, Robinson & Cole, LLP, Stanford, CT, for Defendants.

## MEMORANDUM & ORDER

DEARIE, District Judge.

Defendants move to dismiss plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure based upon plaintiffs' alleged failure to exhaust the administrative claims process provided by their insurance plans. Defendants also request that attorney fees be awarded pursuant to 29 U.S.C. § 1132(g)(1). Plaintiffs argue that they are excused from the exhaustion requirement on the basis of futility.

Defendants' motions are denied.

## BACKGROUND

Plaintiffs bring this class action[1] seeking declaratory judgment, injunctive relief, and to recover damages resulting from defendants' wrongful denial of insurance coverage for the prescription medicine Viagra. In sum, plaintiffs claim that defendants denied benefits in violation of 29 U.S.C. § 1132(a)(1)(B) and that the denial is a breach of fiduciary duties under 29 U.S.C. § 1104. Am.Compl. ¶¶ 53–62.

Defendants Oxford Health Plans (N.Y.), Inc. and Oxford Health Insurance, Inc. (collectively referred to as "Oxford") are insurance companies organized and incorporated under the laws of New York State. John Doe Number 1 and John Doe Number 2 are the plan administrators of the defendant insurance companies. Plaintiffs[2] Patient 1, Patient 2, and Patient 3 are covered under defendants' Freedom Plan. Plaintiff Patient 4 is covered under defendants' Medical Advantage Plan.

Viagra was approved by the FDA as an effective treatment for erectile dysfunction on March 27, 1998. Compl. ¶ 27. Prior to Viagra, the prescribed course of treatment for erectile dysfunction included painful, complicated, and expensive injections, suppositories, and pumps. These methods were covered, and continue to be covered, under defendants' insurance policies. Patient 2 Aff. ¶ 5.

On May 1, 1998, defendants stopped paying for Viagra and announced that it would issue a final policy regarding coverage within 45 days (the "no pay" period). On June 15, 1998, Oxford publically announced that it would pay for only six Viagra pills per month regardless of the number of pills prescribed by the physician (the "six pill" policy).

Each plaintiff claims to suffer from "organic impotence." Am.Compl. ¶¶ 20, 22, 24. Each plaintiff further alleges that his physician prescribed Viagra soon after the FDA had approved its use for impotence. Am.Compl. ¶¶ 32, 33, 34, 35. Plaintiffs challenge defendants' denial of coverage during the 45 day period and the six pill policy.

Defendants argue that plaintiffs failed to exhaust the administrative claims process

---

1. Plaintiffs filed a motion for class certification on September 9, 1998. In light of the outcome of defendants' motion to dismiss, defendants are directed to respond to plaintiffs' motion on or before October 1, 1999. Plaintiffs reply brief, if any, shall be filed on or before October 22, 1999.

2. In an attempt to protect the plaintiffs' privacy, their names will not be used in this opinion. Plaintiffs will be referred to as Patient 1, Patient 2, Patient 3, and Patient 4.

provided by the insurance plans before filing the instant action. Each plaintiff, however, communicated with defendants on numerous occasions in an effort to get an exception from defendants' publically announced policies. Each of the named plaintiffs submitted affidavits detailing their efforts at securing coverage for the prescribed medication.

### Patient 1

Patient 1 is 49 years old. He was diagnosed with prostate cancer in 1996 and underwent a radical prostatectomy. Patient 1 Aff.[3] ¶ 3. The surgery caused erectile dysfunction. *Id.* Soon after Viagra was introduced, Patient 1's physician recommended that Patient 1 take Viagra every day in order to overcome his erectile dysfunction. *Id.* at ¶ 5. The physician sent Oxford a letter of medical necessity. *Id.* Patient 1's wife called Oxford to inquire whether her husband's prescription for Viagra would be covered and was told that there would be no coverage for at least one month. *Id.* at ¶ 6. Patient 1's wife then asked her employer representative to call Oxford on her behalf. *Id.* at ¶ 7. The representative was also told that no prescriptions would be covered for at least one month. Patient 1 Aff. ¶ 7. At no time was Patient 1's wife informed that she could seek further review of the decision during the "no pay" period. *Id.* at ¶ 8.

After the "six pill" policy was implemented, Patient 1's wife called Oxford again to ask whether an exception was available for her husband since his doctor had prescribed a daily dose of Viagra. *Id.* at ¶ 10. She was told there were no exceptions to the policy. *Id.* Patient 1's wife denies receiving a "Certificate of Coverage & Member Handbook." *Id.* at ¶ 11. Patient 1 never presented a prescription for Viagra because he was unable to afford the cost of the full prescription. *Id.* at ¶ 12.

### Patient 2

Patient 2 is 51 years old and has suffered from diabetes since the age of 11. Patient 2 Aff. ¶ 2. In January 1994, he had surgery to remove his right testicle due to a diabetes related atrophic condition. *Id.* at ¶ 4. Patient 2 has experienced erectile dysfunction since the operation. *Id.* On April 14, 1998, Patient 2's physician prescribed 50–milligram tablets of Viagra. *Id.* at ¶ 8. This prescription was filled and covered by defendants without question. *Id.*

The 50–milligram dose was ineffective. As a result, Patient 2's doctor instructed him to take two tablets at a time. *Id.* On April 28, 1998, Patient 2 presented a second prescription for thirty 100–milligram tablets which was rejected by the pharmacy at the direction of the defendants. Patient 2 Aff. ¶¶ 9, 10. Patient 2 called the customer service telephone number located on his Oxford membership card. *Id.* at ¶ 10. He was informed that defendants would not pay for Viagra for a forty-five day period and that there would be no exceptions. *Id.* at ¶ 11. Patient 2 called a second time to speak to an "executive officer" and was again informed that there were no exceptions to the policy. *Id.* at ¶ 12. Dr. Sotiropoulos, Patient 2's treating physician, attempted without success to get Oxford to change its decision. *Id.* at ¶ 13.

After receiving the written notification about the "no pay" period, Patient 2 made a third telephone call and asked to speak with "a person of higher authority." *Id.* at ¶ 14. This "person of higher authority" denied his request for an exception. *Id.* On or about June 15, 1998, Patient 2 read about the "six pill" policy in the newspaper. Patient 2 Aff. ¶ 15. Patient 2 proceeded to call Oxford for a fourth time and asked to speak with a representative of the "Customer Care" department which he

---

**3.** Patient 1's wife submitted the affidavit in support of plaintiffs' opposition to defendants' motion to dismiss since she was the person who actually dealt with defendants and at-tempted to get an exception on behalf of her husband. In the interests of brevity, the affidavit is referred to as Patient 1's Affidavit.

was told was a higher level group than Customer Service. *Id.* at ¶ 16. He was told that the "six pill" policy applied to everyone and his request for 15 pills a month was "flatly" denied. *Id.* at ¶¶ 16–17. Patient 2 was never given any indication that the decision could be "appealed, questioned, or modified." *Id.* at ¶ 16. Defendants also told Patient 2 that there would be no reimbursement for prescriptions filled at the insured's expense within the "no pay" period. *Id.* at ¶ 18. Patient 2 denies ever receiving the "Certificate of Coverage & Member Handbook." *Id.* at ¶ 19.

### Patient 3

Patient 3 is 49 years old. On September 16, 1997, he underwent a radical prostatectomy after being diagnosed with prostate cancer. Patient 3 Aff. ¶¶ 2, 3. The prostatectomy and the subsequent radiation caused complete erectile dysfunction. *Id.* at 4. After hearing about Viagra in the news, Patient 3 called the Dedicated Service Manager assigned to him by Oxford to inquire whether his policy covered Viagra prescriptions. *Id.* at ¶ 5. He was told that Oxford would cover the prescription provided that his doctor forwarded a letter of medical necessity to Oxford. *Id.* On or about April 20, 1998, Patient 3 unsuccessfully attempted to fill a prescription for thirty 50–milligram pills of Viagra. *Id.* at ¶¶ 6–7.

Patient 3 then contacted the employee liaison representative at his office. Patient 3 Aff. ¶ 8. The representative and Patient 3 contacted the Dedicated Service Manager assigned to the employer by Oxford. The Service Manager requested that Patient 3's physician resend the medical necessity letter. *Id.* at ¶ 9. About an hour later the pharmacy called Patient 3 to inform him that his prescription was ready. *Id.* at ¶ 10. However, by the time he got to the pharmacy, Oxford had rescinded the approval. *Id.* The employee representative and Patient 3 called the Oxford Dedicated Service Manager designated to the employer two more times that day in an attempt to determine what had happened. *Id.* at ¶ 11. The following day, the employee representative and Patient 3 called a third time, and were told that the prescription had been rejected because it was for more than six pills. Patient 3 Aff. ¶ 12. Patient 3 then attempted to get six pills. After unsuccessfully attempting to get the six pills, Patient 3 was told that Oxford would only cover 100–milligram tablets, not the 50–milligram tablets prescribed by his doctor. *Id.* at ¶ 13.

After finally receiving the six 100–milligram tablets, Patient 3 called his Oxford Dedicated Service Manager, to inquire how he could get approval for a larger amount of pills given his "condition." *Id.* at ¶ 15. The Oxford Dedicated Service Manager told Patient 3 "that Viagra was strictly for impotence and that if [he] was taking it because [he] had prostrate surgery, [he] was taking it for the 'wrong thing.'" *Id.* After pressing the Service Manager, he was told that the "six pill" policy applied to all policyholders and that there would be no exceptions. *Id.* at ¶ 16.

In June 1998, Patient 3 attempted to fill a prescription that had been written by his doctor before the 45 day "no pay" period. *Id.* at ¶ 23. Patient 3 was informed, without explanation, that the prescription was denied because it had been written before the 45 day "no pay" period. Patient 3 Aff. ¶ 23. The customer service representative told Patient 3 that his doctor would have to write a new prescription and submit another letter of medical necessity. *Id.* Patient 3 asked if he could receive coverage for more than six pills and he was again told that there would be no exceptions to the "six pill" policy. *Id.* At no time was Patient 3 informed that there was a grievance procedure he could pursue. *Id.* at ¶ 16.

On May 1, 1998, Patient 3 sent a complaint letter to the New York State Attorney General's office and a copy to John Sierra, Oxford's Corporate Director of Pharmacy Services. *Id.* at ¶ 21. Oxford never responded to the letter. *Id.* In all,

Patient 3's physician sent Oxford three letters of medical necessity. Patient 3 Aff. ¶ 24. Based on Patient 3's experiences, it is not surprising that he "regarded any further efforts to speak to Oxford as a waste of time." *Id.* at 22.

*Patient 4*

On November 10, 1992, Patient 4 underwent radical prostate surgery due to prostate cancer. Patient 4 Aff. ¶ 3. The surgery resulted in erectile dysfunction. *Id.* On May 13, 1998, Patient 4 received a prescription for ten 50–milligram Viagra pills. *Id.* at ¶ 4. The pharmacy informed Patient 4 that Oxford would not cover the prescription. Patient 4 paid for it out of his own pocket. *Id.* at 5. Patient 4 called an Oxford Customer Service Representative to find out why the prescription was not covered. Patient 4 was told that there would be no Viagra coverage for a few months and that there would be no exceptions. *Id.* at ¶ 6. Patient 4 asked to speak to a supervisor who reiterated the same policy. *Id.* at ¶ 7. Patient 4 was never informed that there was a way to appeal the policy. Patient 4 Aff. ¶ 8.

In addition to plaintiffs' individual dealings with Oxford, there is other evidence to support plaintiffs' belief that defendants' "no pay" and "six pill" policies were not subject to exception or appeal. On April 28, 1998, the New York State Department of Insurance directed insurance carriers to "develop a policy, including any and all conditions, concerning Viagra within forty-five days." Defendants reacted in a peculiar way. Defendants suspended all coverage for Viagra. After the 45 day period, defendants informed the regulator that it had "engaged in an extensive utilization management process to develop its Viagra policy," and that it worked with "medical experts and ethicists to formulate an effective policy." Defendants once again issued a public announcement declaring that its Viagra coverage would be limited to "6 tablets per month" and that to "receive greater than 6 tablets ... per month the Member must self pay." Defendants did not offer any specific findings or medical conclusions supporting the six-pill policy. The public announcement contained no mention of the possibility that the general policy was subject to exception based on medical necessity or any other factor. Indeed, the announcement gave no indication that the policy was in anyway flexible or subject to change.

## DISCUSSION

### A. Standard of Review

Defendants move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure based upon plaintiffs' failure to exhaust the administrative remedies provided for in plaintiffs' insurance plans. The parties submitted affidavits and other exhibits with their motion papers. Under Rule 12(b)(6), if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided for under Rule 56, and all parties shall be given reasonable opportunity to present material made pertinent to such a motion by Rule 56." Fed.R.Civ.Proc. 12(b)(6). The issue before the Court has been extensively briefed by experienced counsel who no doubt fully understand that the matter is more appropriately addressed in the context of summary judgment.

Summary judgment is appropriate only when "there is no genuine issue as to any material fact." Fed.R.Civ.Proc. 56(c). The moving party bears the burden of demonstrating that there are no genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing summary judgment "may not rest upon mere allegations or denials of" the moving party's pleadings. Fed.R.Civ.P 56(e). The Court must draw all reasonable inferences and ambiguities in favor of the non-moving party. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

For the reasons explained below, summary judgment is denied.

## B. The Requirement of Exhaustion

■ Section 503(2) of the Employee Retirement Income Security Act ("ERISA") requires that "every employee benefit plan shall ... afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133 (1998). There is no statutory requirement that plaintiffs exhaust administrative processes before filing an action in federal court. However, relying on § 1133, "courts have 'developed the requirement that a claimant should ordinarily follow internal plan procedures and exhaust internal plan remedies before seeking judicial relief under ERISA.'" *Ludwig v. NYNEX*, 838 F.Supp. 769, 781 (S.D.N.Y.1993), *quoting* John H. Langbein & Bruce A. Wolk, Pension and Employee Benefit Law 588 (1990); *see also Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir.1993) (dismissing action based on plaintiff's failure to pursue plan remedies).

The purposes of the judicially created exhaustion requirement are to:

> (1) uphold Congress' desire that ERISA trustees be responsible for their actions, not federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard not de novo.

*Kennedy*, 989 F.2d at 594 (citations omitted). Courts have also noted that the exhaustion requirement is intended to: reduce the number of frivolous lawsuits, promote consistent treatment of claims, provide nonadversarial method of claim settlement, and minimize costs. *See Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980).

■ As set forth in defendants' motion papers, both the Freedom Plan and the Medical Advantage Plan provide a framework for appealing adverse decisions. Defs.' Br. in Supp. of Mot. to Dismiss at 5–8. These review procedures are outlined in a "Certificate of Coverage and Member Handbook." *Id.* at Exs. B, C. According to the Membership policy for the Freedom Plan, the prescribed "[g]rievance [p]rocedure ... should be used when [a member has] a problem with any of [Oxford's] polices, procedures or determinations" other than a determination that a service is not medically necessary. Ex. B. at 22. The grievance procedure "may" be initiated by a telephone call to a customer service representative. *Id.* at 23. From there, the policy states that the insured "may" file, either by telephone or in writing, a grievance with the Issues Resolution Department. *Id.* Subsequently, an unsatisfied insured "may" file a written grievance with the Grievance Review Board. *Id.* If the insured is still dissatisfied, he "may" appeal in writing to a Committee of the Board of Directors. *Id.* Finally, an insured "may" appeal a final decision to the New York State Insurance Department or Department of Health. *Id.*

Alternatively, to challenge a determination concerning "medical necessity," an insured "may" appeal within 45 days in writing or by calling the Medical Management Appeals Department. Ex. B at 24. If an insured is not satisfied with the result of that appeal, he "may" appeal to the Board of Directors. *Id.*

Under the Medical Advantage Plan, an insured "may" initiate an appeal process after a denial is issued by submitting a written request. Ex. C. at 29. If the insured is still dissatisfied, the insured "may request, verbally or in writing, that the grievance be presented to the Health Plan Grievance Review Board." *Id.* Neither policy alerts the policyholder that these apparently permissive avenues of redress are preconditions to commencing a legal action.

Exhaustion of the statutorily required administrative process is not always required. Most notably, exhaustion is excused "where claimants make a 'clear and positive showing' that pursuing available administrative remedies would be futile." *Kennedy*, 989 F.2d at 594. To fall within the futility doctrine, claimants must "show that it is certain that their claim will be denied on appeal, not merely that they doubt an appeal will result in a different decision." *Communications Workers of America v. American Tel. & Tel. Co.*, 40 F.3d 426, 432 (D.C.Cir.1994). The exhaustion doctrine, however, does not require plaintiffs to "engage in meaningless acts or to needlessly squander resources as a prerequisite to commencing litigation." *Corsini v. United Healthcare Corp.*, 965 F.Supp. 265, 268 (D.R.I.1997).

Courts have been unwilling to conclude that pursuit of the administrative process is futile absent evidence that a plaintiff sincerely attempted to resolve its dispute extrajudicially. Certainly, an allegation of futility is not satisfied by the mere showing that a claim was denied when initially presented to the insurance company. *Communications Workers*, 40 F.3d at 433; *see also Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir.1989) (dismissing plaintiff's claim where no attempt to challenge insurer's denial of coverage was made). Nor is futility demonstrated by the fact that the members of a review committee consist of the insurance company's management rather than a neutral arbitrator. *Amato*, 618 F.2d at 568; *Communications Workers*, 40 F.3d at 433. *But see Jonas v. New York State Soc'y of CPA Ins. Plans*, No. 91–CV–4399, 1992 WL 390291, at *3–4 (E.D.N.Y. Dec. 8, 1992) (Spatt, J.) (finding genuine issue of material fact as to whether claimant properly appealed adverse decision where only

review process was reconsideration by same person who initially denied claim).

The case at bar differs significantly from these cases. According to plaintiffs' affidavits, numerous telephone calls were made to defendants in an effort to get an exception to the "no pay" and six pill policies. Plaintiffs' physicians were required to, and did, submit letters of medical necessity, in some cases on more than one occasion. In one instance, a treating physician interceded on behalf of his needy patient. Regardless of the efforts and opinions of plaintiffs' physicians, defendants consistently denied coverage during the 45 day no-pay period and coverage beyond six pills after that policy was announced. One plaintiff's wrote a complaint letter to the New York State Attorney General's office. Despite the fact that plaintiff copied Oxford's Corporate Director of Pharmacy Services, Oxford never responded to the letter.[4]

Defendants take great comfort in a recent Southern District decision. In an unpublished decision, Judge Martin concluded that a plaintiff had not demonstrated that exhaustion was futile even though she wrote four letters to Oxford and met with an Oxford representative to discuss Oxford's denial of 24 hour private nursing care. *Fay v. Oxford Health Plans*, 98 CV 0350 (S.D.N.Y. Jul. 31, 1998). In *Fay,* Oxford refused to pay for private nursing care because in its opinion placement in a Skilled Nursing Facility was not only less expensive but "a superior option because it provide[d] a full range of health options" to the plaintiff. *Id.* The differences between this case and the case at bar are obvious. First, the plaintiff in *Fay* challenged a care decision applicable only to her, not to all members. Second, Oxford provided alternative coverage that in their opinion was superior to the coverage requested by the plaintiff. The dispute in

---

4. In their reply brief, defendants note that the letter did not specifically "request that Oxford review, or take any particular action, regarding [the insured's] claim." Apparently, defendants did not feel obligated to respond to Patient 3's concerns because the letter was not addressed to them.

*Fay* was not about a blanket denial of coverage, but instead whether the coverage offered was appropriate to the insured's medical needs. In the instant case plaintiffs are challenging a policy that they have been told over and over again is not subject to exception. In addition, defendants have not offered any comparable alternatives to plaintiffs. Everyone seems to recognize that there are no other currently available alternatives to Viagra except the cumbersome and uninviting choices of the past.

Other cases are far less sympathetic to Oxford's theory of defense. Exhaustion has been excused when the plaintiff alleged that she was unaware of an appeals process and the defendant insurance company failed to plead or supply proof of the existence of, or plaintiff's knowledge of, the appeal process. *Novak v. TRW Inc.*, 822 F.Supp. 963, 969 (E.D.N.Y.1993) (Wexler, J.); *Clay v. ILC Data Device Corp.*, 771 F.Supp. 40, 45 (E.D.N.Y.1991) (Wexler, J.). Similarly, futility has been demonstrated when an employee made inquires to management on four different occasions about the reinstatement of his pension and was never informed of his right to appeal the denial. *Ludwig*, 838 F.Supp. 769, 781 (S.D.N.Y.1993).

Exhaustion has also been satisfied where an insurance company failed to timely respond to a claimant's written request to review its denial of benefits. *Ritzer v. Nat'l Org. of Indus. Trade Unions Ins. Trust Fund Hosp.*, 807 F.Supp. 257, 260 (E.D.N.Y.1992) (Nickerson, J.). An insurance company's steadfast refusal to extend benefits in response to a claimant's multiple requests was sufficient to overcome the exhaustion requirement even though the plaintiff filed the complaint two months before the actual denial of benefits. *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 405 (7th Cir.1996). Finally, futility was demonstrated by an insurance company's unexplained refusal to accept a treating physician's opinion that certain services were "medically necessary."

*McGraw v. Prudential Ins. Co.*, 137 F.3d 1253, 1264 (10th Cir.1998).

Insurers have also invoked the judicially crafted exhaustion requirement to argue that claimants challenging general policies may not initiate an action before using the administrative claims process provided by the insurance plan. However, plan participants were not required to pursue administrative remedies when they sought to challenge the calculation of co-payment obligations under a "long standing policy" that was consistently applied and "vigorously" defended by the insurance company. *Corsini*, 965 F.Supp. at 269–70. Similarly, exhaustion would have been futile when it was clear that the company had adopted a policy of denying all applications for a specific plan. *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 917 (3d Cir.1990).

Defendants argue that the fact that the "no pay" and "six pill" policy are uniform and generally applicable, does not in itself excuse exhaustion. Defendants primarily rely on the Second Circuit's opinion in *Kennedy*. In *Kennedy*, the plaintiffs challenged the insurance company's reformulation of the geographic zones used in determining physician reimbursement amounts. *Kennedy*, 989 F.2d at 589. The Second Circuit rejected the plaintiffs' claims of futility based upon a finding that the plaintiffs took "no action whatsoever with respect to their disputed claims." *Id.* at 594. The plaintiffs never notified the defendant of any disputed claim before bringing the action in federal court. *Id.* The court rejected the plaintiffs' argument that the correspondence between the defendant and the plaintiffs demonstrated that an appeal would be futile. *Id.* at 594.

Once again, the facts in *Kennedy* are wholly different from the case at bar. In *Kennedy*, the correspondence between the defendants and plaintiffs explicitly made reference to the available avenues of appeal. *Id.* at 591. Here, other than the fact that the appeal process was set forth in the membership handbook (that some plaintiffs deny ever receiving), the avail-

ability of an appeal process and the mandatory nature of it were never expressly communicated to plaintiffs before the filing of this complaint. A fully informed insured might be hard pressed to argue that he or she should be excused from complying with an express condition of coverage.

As described above, each of the named plaintiffs claims to have had telephone contact with defendants on numerous occasions. Each of the plaintiffs denies ever being informed that they had the right to appeal to a "higher authority." Defendants deny any record of any telephone calls by plaintiffs and argue that the appeal procedure is clearly set forth in the Membership Handbook. According to defendants, employers are responsible for ensuring that insureds receive the appropriate membership materials. It is curious that defendants plead the doctrine of exhaustion as a shield against litigation, yet rely on others to ensure that policyholders are aware of the administrative process rather than simply educating policyholders about the need to exhaust at the time adverse decisions are made.

The same interests identified by courts in favoring administrative review are served by requiring carriers to ensure that their insureds are aware of opportunities within the administrative scheme to seek review or reconsideration. Relying on a simple provision in a handbook that the employee may or may not see, much less understand, is unreasonable and merely encourages the slight of hand suggested here. The industry may not have it both ways—insisting on compliance with the judicial requirement of exhaustion and at the same time, hiding the requirement behind an arguably thicket of misleading legalese.

Assuming *arguendo* that plaintiffs were aware of their need to pursue all administrative appeals and the procedure for pursuing such appeals, there is overwhelming evidence that such efforts would have been futile. While an insured's belief, even in good faith, cannot by itself justify bypassing a contractually binding review process,

there are circumstances here, not genuinely in dispute, that make it perfectly clear, as the course of events now confirms, that Oxford would not make any exceptions to the announced policy. Each of the four named plaintiffs called defendants on numerous occasions and received the same "no exceptions" answer to their repeated pleas for consideration. Letters of medical necessity sent to Oxford by treating physicians had no impact on plaintiffs' efforts to obtain coverage. Plaintiffs Patient 2, Patient 3, and Patient 4 allege that they spoke with higher level employees and received the same answer. How many times can policyholders be expected to contact their insurance company before concluding that they are wasting their time? The question is particularly germane when the insurance company's refusal to pay is in keeping with a publically announced policy applicable to all insureds.

Finally, there remains a genuine question as to whether exhaustion should be required in a case of this nature. In the face of a company-wide promulgation of limited or no coverage unrelated to the personal circumstances of individual claimants, it is fair to question whether it makes sense to require insureds to jump through procedural hoops on their way to an inevitable denial of coverage. The same worthy considerations that spawned the judicially crafted exhaustion requirement in individual cases seem to counsel against such a precondition in those cases that feature across the board company-wide coverage policies. Indeed exhaustion for the sake of exhaustion, without any reasonable expectation of relief, serves no legitimate purpose except to deter insureds from seeking redress in the only forum that would offer a meaningful opportunity to vindicate rights secured in the insurance contract.

The named plaintiffs in this case acted entirely reasonably. When faced with Oxford's sudden denial of coverage, they contacted the insurer directly or with the help of the employer's representative for reconsideration and an explanation. They per-

sisted in their request for coverage; they provided medical documentation; they pursued their claims up the hierarchy of Oxford's bureaucracy, and, quite understandably, came eventually to recognize that relief would not come from Oxford at any level. Ultimately, Oxford proved them right. Nevertheless, Oxford now argues that they stopped too soon and despite their entirely reasonable efforts, that misjudgment has cost them the opportunity to press their claims before this Court.

Oxford's position seems particularly untenable when seen in the light of the policy language itself. In neither policy handbook, is the insured instructed that administrative remedies *must* be utilized. These materials are strangely silent on the exhaustion requirement that Oxford now embraces with such enthusiasm. Like the named plaintiffs, insureds are left to their own devices, instructed that they *should* use the grievance procedure and *may* file a claim or *may* appeal, as the exhaustion requirement lurks in the background waiting to be deployed should a frustrated policyholder seek to initiate judicial proceedings. The scenario offends notions of fairness and common sense.

Defendants' motions are denied.

SO ORDERED.